Dustin TROWBRIDGE, Appellant (Defendant),

v.

STATE of Indiana, Appellee (Plaintiff).

No. 48S00–9711–CR–00633.

Supreme Court of Indiana.

Oct. 4, 1999.

Rehearing Denied Nov. 24, 1999.

Donald H. Hurst, Anderson, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Janet Brown Mallet, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SELBY, J.

Dustin Trowbridge ("Trowbridge" or "Defendant") was convicted by a jury of murder, rape, robbery, burglary, criminal confinement, aggravated battery, theft, auto theft, and abuse of a corpse. Trowbridge also pleaded guilty to escape. He was sentenced to a term of one hundred and ninety-nine (199) years for all of his crimes. Trowbridge was fourteen years old at the time of the murder, but was waived into adult court.

In this direct appeal, Trowbridge argues that the trial court committed reversible error in not granting Defendant's Motion to Suppress on grounds that his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, and Article I, § 11 of the Constitution of the State of Indiana were violated by the State. Trowbridge further argues that the evidence and confession were obtained as a result of an unlawful search and should be held inadmissible under the exclusionary rule. Finally, Trowbridge claims his confession was obtained as a result of a faulty waiver of his right to remain silent and violations of Indiana's juvenile waiver statute.[1] Under Indiana Appellate Rule 4(A)(7), this Court has exclusive jurisdiction over Trowbridge's appeal. We affirm the trial court on all issues raised, but reverse Defendant's rape conviction and reduce Defendant's sentence to a total of ninety-seven (97) years.

### Factual and Procedural Background

The facts viewed most favorable to the State are as follows. On the evening of May 2, 1996, Doris Swindell's two sisters, her daughter, and her son-in-law discovered Swindell, age sixty-nine, dead in her trailer. The Anderson Police Department initiated an investigation which uncovered the following chain of events.

In the late afternoon of May 2, 1996, Dustin Trowbridge, age fourteen, went into the woods near his trailer and "huffed"[2] clear enamel paint. Trowbridge then secretly entered Doris Swindell's trailer, hid in her bedroom, and watched Swindell through the window while she watered her lawn. When Swindell came inside Trowbridge beat her, choked her, forced her to the floor, and ultimately strangled her to death with the swimsuit she was carrying. Trowbridge moved Swindell to her bed and forced intercourse, though the forensic pathologist could not determine whether Swindell was dead or alive at the time. When he was done, Trowbridge threw a blanket over Swindell's body, went home, and took a shower. While Trowbridge was in Swindell's house, he took jewelry, $155 cash, and car keys.

Trowbridge drove Swindell's car that evening, picked up and visited friends, and used Swindell's money to buy fast food, ice cream, and computer duster fluid to "huff" with his friends. At the end of the evening, Trowbridge parked the car in a business parking lot near the trailer park and walked home. Upon returning to his trailer, Trowbridge ate a steak dinner and then hid the various items he had taken from Swindell. Trowbridge watched as police began to arrive at Swindell's trailer and listened to his mother's fiancé's scanner to track developments.

Trowbridge lived with his mother, Marlene Frost, his mother's fiancé, Tim Gill, and two younger brothers. Gill was a police officer with the Town of Edgewood Police Department and arrived home from working second shift at around 11:15 p.m. on May 2, 1996. Gill knew there had been a homicide and, still in his police uniform, walked to the crime scene and inquired as to the investigation. Later that night, Trowbridge seemed nervous, questioned why there were so many police officers at the scene, and carried Gill's scanner around. Trowbridge also asked Gill whether the police could find fingerprints on a body. Gill began to suspect that Trowbridge might have information regarding the crime.

---

1. Ind.Code § 31–6–7–3 (1996) was in effect at the time of Trowbridge's confession. It has since been repealed and replaced by Ind.Code § 31–32–5 (1997), which embodies substantially the same language as § 31–6–7–3, though the provisions have been broken into seven sections.

2. "Huffing" is a process by which one uses school, office, or household products to get high. The user covers his or her mouth and nose with a rag saturated in the chemical and inhales. The Greater Indianapolis Council on Alcoholism, *Just the Facts: Inhalants* (1995).

On the morning of May 3, 1996, Anderson Police Detective Terry Sollars interviewed residents of the mobile home park where Doris Swindell lived. Sollars did not stay long at Trowbridge's trailer, but noticed that Trowbridge became agitated and paced around after Sollars showed Gill, Frost, and Trowbridge photos of Swindell's car. Soon after Sollars left Trowbridge's trailer, Gill walked to where Sollars was standing with other officers and advised Sollars that he should question Trowbridge again and not rule him out as a suspect.

Sollars and three other detectives returned to Trowbridge's mobile home. Trowbridge briefly left the trailer with two detectives because he was uncomfortable responding to the detectives' questions in front of his mother. While Trowbridge was outside telling the detectives that he had been "huffing" the night before, Gill and Frost told Sollars they were concerned because there was a knife in a tackle box on the patio and Trowbridge had been hovering around the box. Frost was concerned that Trowbridge would become nervous and use the knife against the detectives, though she did not tell Sollars of her specific fear. Sollars, Frost, and Gill went to the tackle box and Gill stated that the tackle box was his. Sollars or Gill then opened the tackle box. Inside the tackle box, Sollars found the knife, as well as a roll of money and keys. Gill and Sollars walked to Swindell's mobile home and confirmed that the keys found in the tackle box fit Swindell's door.

Sollars returned to Trowbridge's home and placed Trowbridge in custody. Sollars then told Frost that Trowbridge was a suspect in Swindell's murder. Sollars requested and received a search warrant from a local judge and found additional evidence in Trowbridge's bedroom. The investigation also uncovered Trowbridge's fingerprints in Swindell's car and a statistically significant DNA match between Trowbridge and the semen in Swindell's body.

We will recite below additional facts pertinent to this decision.

## I. Search and Seizure

Trowbridge contends the state violated his state and federal constitutional rights to be free of unreasonable search and seizure when Detective Sollars secured evidence from the tackle box without a search warrant. The Fourth Amendment to the United States Constitution prohibits police from conducting warrantless searches and seizures except under limited circumstances. *See Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85, 95 (1990) (citation omitted); *Perry v. State*, 638 N.E.2d 1236, 1240–41 (Ind.1994); *Wright v. State*, 593 N.E.2d 1192, 1198–99 (Ind.1992). The language of the Indiana Constitution, Article I, § 11, mirrors the federal protection. *See Hawkins v. State*, 626 N.E.2d 436, 439 (Ind.1993). However, the tests for determining a rights violation differ for the state and federal provisions.

Federal Fourth Amendment law protects citizens, including juveniles, from warrantless searches of places or items in which the individual has an actual, subjective expectation of privacy which society recognizes as reasonable. *See United States v. Doe*, 801 F.Supp. 1562, 1572 (E.D.Tex.1992). One exception to the federal prohibition on warrantless searches exists where consent to a search is given by a third party who has common authority over the premises. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50 (1974); *Brown v. State*, 691 N.E.2d 438, 443 (Ind. 1998) (citations omitted); *Perry v. State*, 638 N.E.2d at 1240–41; *Wright v. State*, 593 N.E.2d at 1199; *Stallings v. State*, 508 N.E.2d 550, 552 (Ind.1987) (citations omitted).

Trowbridge argues he had a privacy interest in the tackle box that was violated when Gill (1) improperly consented to a search of Trowbridge's personal property in Trowbridge's absence, and (2)

acted as a law enforcement officer in the Anderson Police Department's investigation of Swindell's murder. With respect to Trowbridge's asserted privacy interest, Gill lived in the trailer with Frost and her children and, at the time of the search, Gill told Sollars that the tackle box belonged to him, not to Trowbridge. In addition, the tackle box was located outside, on the patio, in a common area. The tackle box was not in a place, such as Trowbridge's bedroom, where the officer might have suspected a privacy interest on Trowbridge's behalf. Gill requested the search of the tackle box at Frost's urging. Frost and Gill, as the adults of the household, observed the search of the tackle box.

■ "'[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person'" who shares the authority. *Brames v. State*, 273 Ind. 565, 406 N.E.2d 252, 255 (1980) (quoting *Bruce v. State*, 268 Ind. 180, 236, 375 N.E.2d 1042, 1072 (1978) (citations omitted)). Common authority depends on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection...." *Perry v. State*, 638 N.E.2d at 1241 (citing *Stallings v. State*, 508 N.E.2d at 552). Even if the third party who consents to a search does not have common authority over, or the requisite relationship to, the premises, the warrantless search is still valid if the officers reasonably believed the third party had common authority or the requisite relationship. *See Canaan v. State*, 683 N.E.2d 227, 231–32 (Ind.1997) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179, 110 S.Ct. 2793, 2796, 111 L.Ed.2d 148, 155 (1990)); *Perry v. State*, 638 N.E.2d at 1241 (citation omitted). Detective Sollars reasonably believed that Gill had authority over the tackle box and could consent to its search.

■ Defendant's suggestion that Gill was acting as an agent of the government, and therefore the search of the tackle box violated Trowbridge's right to be free from a warrantless state search, is without merit. Gill had no official role in the Anderson Police Department's investigation of Swindell's murder. Gill's actions were not an extension of his occupation as a police officer for the Town of Edgewood Police Department. Gill's only involvement was that of a concerned, supervising adult in Trowbridge's home. Gill had lived with Trowbridge for over three years and was father to Trowbridge's stepbrother. He had a personal relationship with Trowbridge which, though strained at times, resulted in Gill knowing Trowbridge's character and juvenile history. Gill came to suspect, on his own accord and through conversations with Frost, that Trowbridge had information regarding the murder. Gill was off-duty and out of uniform the day of the tackle box search. The fact that Gill was wearing a police academy sweatshirt is immaterial. Gill's suggestions to Detective Sollars that he further question Trowbridge and view the contents of the tackle box, and Gill's accompanying Sollars to test the keys on Swindell's trailer do not exceed actions to be expected of a concerned, supervising adult and responsible citizen.

■ Under the Indiana Constitution, the State must show that a search was reasonable in light of the totality of circumstances. *See Brown v. State*, 653 N.E.2d 77, 79–80 (Ind.1995). For the reasons cited above in our federal Fourth Amendment analysis, the search of the tackle box was reasonable in view of the surrounding circumstances.

Because the search of the tackle box and seizure of its contents was legal under both the Indiana and United States Constitutions, the derivative evidence and confession that flowed therefrom are not "fruits of the poisonous tree" subject to the exclusionary rule. The trial court properly admitted the evidence.

## II. Admissibility of Confession

The day after Swindell's murder, Trowbridge and Frost waived Trowbridge's right to remain silent and to receive assistance of counsel. After Trowbridge was placed into custody, he was transported to the Anderson Police Department where he and Frost were taken to an interrogation room. Detective Hay read rights to both Trowbridge and Frost, including Trowbridge's right to have one or both parents present and to consult them regarding the case. Hay confirmed with both Trowbridge and Frost that they understood their rights, and Trowbridge and Frost both signed a statement to that effect. Hay then informed Trowbridge and Frost they were entitled to a private conference and asked them each if they wanted to speak privately with each other. Hay offered to turn the tape off and leave the room. Trowbridge and Frost both declined Hay's offer of a private conference. Trowbridge and Frost both signed a waiver of Trowbridge's right to remain silent. Trowbridge indicated that he preferred Frost leave the room during the interrogation. Hay told Frost that, despite Trowbridge's expressed preference, Frost was entitled to remain during the questioning if she so chose. Frost responded that she wanted to leave the room and confirmed she was doing so of her own free will.

Shortly after Frost left the interrogation room, Trowbridge asked Hay, "How is it on that paper? It said that my mom gave consent for me not to remain silent." (R. at 213, 1593–94.) Hay told Trowbridge that because he was a juvenile, his mom had to agree with him that it was all right for Trowbridge to speak to the police. Detective Collins then intervened and told Trowbridge that they were going to leave the room and give Trowbridge a "break" with his mom, an opportunity to speak to her in "confidence," before they started questioning him. (R. at 213, 1594.) Trowbridge and Frost were in the room together for four and one-half minutes when Frost left the room and the consultation was over. Trowbridge then gave a full confession to the murder of Doris Swindell.

Trowbridge argues that the waivers did not conform to Indiana's statutory requirements. At the time of Trowbridge's confession, Indiana Code § 31–6–7–3 (1995) set out specific requirements for a valid waiver by a juvenile of Indiana state or federal constitutional rights. The statute provided in pertinent part as follows:

(a) Any rights guaranteed to the child under the Constitution of the United States, the Constitution of Indiana, or any other law may be waived only:

(1) by counsel retained or appointed to represent the child, if the child knowingly and voluntarily joins with the waiver;

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

(A) that person knowingly and voluntarily waives the right;

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver; or . . . .

Indiana Code § 31–6–1–9 (1995) defined "child" as a person under eighteen years of age. Trowbridge was fourteen years of age at the time of the confession. Pursuant to Indiana Code § 31–6–1–9, Trowbridge was a "child" at the time of the confession and entitled to the juvenile code protections.

Trowbridge challenges the admissibility of his statements on four grounds. First, he contends that Frost did not knowingly and voluntarily waive the right because no one told her that Trowbridge was a suspect in Swindell's murder, she was ill and unable to think clearly, and she was compelled to cooperate and consent because she would be subject to a contempt of court citation for failing to comply with Trowbridge's house arrest order. Second,

Trowbridge contends that Frost's interests were adverse to Trowbridge's by virtue of the house arrest order requiring Frost to report any violation to the authorities. Third, Trowbridge asserts that he did not knowingly or voluntarily join in Frost's waiver because the officers ignored Trowbridge when he indicated a desire to stop the interrogation. Finally, Trowbridge argues that he was denied an opportunity for meaningful consultation with his mother. The trial court denied Trowbridge's pretrial motion to suppress his confession.

## A. Knowing and Voluntary Waiver by Mother

■ When determining whether a waiver of rights during interrogation was made knowingly and voluntarily, the court considers all of the circumstances of the waiver including: the child's physical, mental, and emotional maturity; whether the child or his parent understood the consequences of his statements; whether the child and his parent had been informed of the act with which the child was charged or of which he was suspected; the length of time he was held in custody before consulting with his parent; whether there was any coercion, force, or inducement; and whether the child and his parent had been advised of the child's right to remain silent and to appointment of counsel. *See* Ind.Code § 31–6–7–3(d) (1995). The appellate standard for reviewing a trial court's ruling on the voluntariness of a waiver is to consider only uncontested evidence and evidence favorable to the state in light of the totality of circumstances. *See Carter v. State*, 686 N.E.2d 1254, 1257 (Ind.1997) (citing *Tingle v. State*, 632 N.E.2d 345, 352 (Ind.1994)).

■ Despite Trowbridge's claim that Frost did not know that Trowbridge was a suspect in Swindell's murder, the record indicates Detective Sollars specifically told Frost that Trowbridge was a suspect after Sollars placed Trowbridge in custody. However, a waiver can be made knowingly even where the parent is not specifically apprised of the charges against the child or the act of which the child is suspected. *See, e.g., Carter*, 686 N.E.2d at 1258 (confession and waiver upheld where mother and child had not been told that child was a suspect but mother was aware of victim's murder, rights were read, and waivers were signed); *Tingle v. State*, 632 N.E.2d 345, 352–53 (Ind.1994) (admissibility of confession upheld where officers read rights and grandmother signed waiver despite fact that grandmother had not been informed of the potential charges or possibility of child being tried as an adult); *Smith v. State*, 580 N.E.2d 298, 301 (Ind. Ct.App.1991) (waiver upheld where mother failed to appreciate the fact that her son was in jeopardy of prosecution). Frost was aware of Swindell's murder, was concerned that her son had information about or was somehow involved in the murder, and should have appreciated that her son was in jeopardy of prosecution.

■ Trowbridge's claim that Frost was so physically ill and distraught that she was unable to think clearly is unsubstantiated by the record. Nothing in the record indicates that Frost's illness was debilitating or exceeded the nervousness, and physical manifestation thereof, natural for a parent concerned with her child's welfare. Frost communicated clearly with the officers, promptly answered the detective's questions regarding her rights, unambiguously rejected the offer to consult privately with Trowbridge, and plainly stated her desire to leave the room during the interrogation.

■ Trowbridge also argues that Frost cannot have waived Trowbridge's rights under the juvenile waiver statute because her waiver was coerced. Frost had signed a house arrest contract on February 23, 1996 pursuant to Trowbridge's release from secure care to house arrest following prior unrelated delinquency proceedings. Under the contract, Frost agreed to supervise Trowbridge's adherence to the conditions of his probation and to report any

violation by Trowbridge to Juvenile Probation. Failure to notify Juvenile Probation of violations would have subjected Frost to a contempt of court citation. Trowbridge argues that the threat of a severe penalty for not complying with the house arrest contract compelled Frost to waive involuntarily Trowbridge's rights. However, the house arrest contract had expired in April, 1996 and Frost allowed Trowbridge to leave the house on the day of the murder because she knew the contract had expired. Even if the document could be found to give rise to the argued compulsion during its pendency, it did not do so after the contract expired and Frost knew of the expiration. Frost was not compelled by the house arrest contract to waive Trowbridge's rights.

### B. Adverse Interests

■ Defendant next argues that Frost was an adverse party to his interests and could therefore not serve as the adult who waives his rights under the juvenile waiver statute. Trowbridge cites *Borum v. State* to support his argument that Frost was an adverse party. 434 N.E.2d 581, 583–84 (Ind.Ct.App.1982). We disagree that *Borum* controls. In *Borum,* the waiver was defective because the child's legal guardian who joined in the waiver was an employee of the state Department of Public Welfare, she initiated the proceedings against the child, and the Department of Public Welfare was represented by an attorney who served as the prosecuting agent for the state. *See id.* at 583. Frost was not an employee of the state. In contrast, in *M.R. v. State,* we did not find an adverse interest where a mother who waived her child's constitutional rights had brought the child to the police after he ran away in violation of probation. 605 N.E.2d 204, 207 (Ind.Ct.App.1992).[3] The fact that

Frost notified authorities regarding her concern about Trowbridge's involvement in the Swindell murder is insufficient to render her interests adverse. We find, under the totality of circumstances, that Frost's obligations under the house arrest contract did not render her adverse to Trowbridge's interests and her waiver was voluntary.

### C. Meaningful Consultation and Knowing and Voluntary Waiver by Defendant

■ Trowbridge next claims that he did not knowingly or voluntarily join in the waiver of his rights because he indicated to Detective Hay that he wished to stop the interrogation. Trowbridge cites *United States v. Pena,* 897 F.2d 1075, 1082 (11th Cir.1990), which held that when a defendant indicates, even ambiguously, that he desires not to cooperate or that he desires to remain silent, officers must stop questioning and clarify the uncertainty. Trowbridge's query regarding his mother's waiver did not amount to an indication that he wanted to stop questioning. Nevertheless, Detective Collins did cease the questioning at that point and gave Trowbridge and Frost an unsolicited opportunity to consult privately in spite of their earlier rejection of the offer. After the brief consultation, Trowbridge began his confession and never indicated a desire to terminate the session.

■ Only juveniles have the added statutory protection of a "meaningful consultation." *Hickman v. State,* 654 N.E.2d 278, 281 (Ind.Ct.App.1995) (citing *Foster v. State,* 633 N.E.2d 337, 347 (Ind.Ct.App. 1994)), *trans. denied.* The requirement may be satisfied by "actual consultation of a meaningful nature or by the express opportunity for such consultation, which is then forsaken in the presence of the prop-

---

**3.** *See also Whipple v. State,* 523 N.E.2d 1363, 1369–70 (Ind.1988) (grandfather, whose daughter and son-in-law were the victims of the murder charge against their son, legally served as the juvenile's guardian for purposes of joining in the juvenile's rights waiver prior

to confession); *Graham v. State,* 464 N.E.2d 1, 4 (Ind.1984) (evidence that juvenile's relationship with his father was strained, if not hostile, was insufficient to establish an adverse interest on the part of the father).

er authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his constitutional rights." *Williams v. State*, 433 N.E.2d 769, 772 (Ind.1982). The facts surrounding Trowbridge's and Frost's "meaningful consultation" are virtually identical to those in our decision in *Carter. See* 686 N.E.2d at 1258. The police read rights to both Trowbridge and Frost. They acknowledged hearing the rights and understanding them. Trowbridge and Frost were presented with a waiver of rights form. They both acknowledged verbally that they understood the rights. Trowbridge and Frost willingly signed the form stating that they had been apprised of Trowbridge's rights. They "were given an opportunity to consult privately with each other immediately after the rights were read." *Id.* "They declined the opportunity to consult." *Id.* "They then signed the form again to indicate that they waived" Trowbridge's constitutional rights. *Id.* The facts of this case and *Carter* differ in that the police actually imposed a private consultation on Trowbridge and Frost after Trowbridge asked about his mother's waiver. Trowbridge and Frost were given two opportunities for meaningful consultation. They declined the first offer and later chose not to consult when left alone in the interrogation room expressly for that purpose. The protections of the juvenile waiver statute ensure that juveniles have the opportunity to engage in meaningful consultation with their parent or guardian regarding allegations, the circumstances of the case, and the ramifications of their responses to police questioning and confessions. Officers are unable, and cannot be expected, to force substantive communication between children and their parents.

There is no evidence in the record that Trowbridge and Frost were coerced, forced, or otherwise induced to waive their rights and enter a confession. We find that under the totality of circumstances, the trial court properly determined that both Trowbridge and his mother knowingly and voluntarily waived Trowbridge's rights in full compliance with statutory requirements.

### III. Defendant's Sentence

Defendant was charged with ten counts including murder, rape, robbery, burglary, aggravated battery, criminal confinement, theft, auto theft, abuse of a corpse, and escape. He was convicted by a jury on all counts except escape, to which he pleaded guilty. Defendant did not challenge his sentence or conviction on appeal; we nevertheless address the appropriateness of the sentences under our constitutional authority to review and revise sentences. *See* Ind. Const. art. VII, § 4.

■ Trowbridge was convicted of both rape and abuse of a corpse. Knowingly having sexual intercourse with Swindell formed the basis of both charges. However, the forensic pathologist testified that it was not possible to determine whether Swindell was dead or alive when Trowbridge had intercourse with her. Although somewhat confused as to the facts of the forensic testimony, Trowbridge's counsel attempted to argue in his closing argument and at the sentencing hearing that Trowbridge could not be convicted of both rape and abuse of a corpse, presumably because that would violate the double jeopardy and multiple punishment prohibitions in the Indiana Constitution and under Indiana common law. No evidence was presented to support the prosecution's argument that Swindell was alive when Trowbridge had intercourse with her. Trowbridge's confession presents evidence that Swindell was in fact dead when he had intercourse with her. In view of the elements of Count II of the Information, Rape,[4] and Count IX of the Information,

---

4. Ind.Code § 35–42–4–1 (1989).
 Rape. Sec. 1. A person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when:

 (1) the other person is compelled by force or imminent threat of force;
 (2) the other person is unaware that the sexual intercourse is occurring; or

Abuse of a Corpse,[5] respectively, convicting Trowbridge of both crimes appears to punish him twice for the same act. We therefore reverse Trowbridge's conviction on the rape charge.

 Trowbridge received the maximum aggravated sentence for all ten of his convictions. Indiana's Constitution "requires that a sentence be proportional to both the nature of the offense and the character of the offender." *Gambill v. State*, 675 N.E.2d 668, 678 (Ind.1996). In addition, the penal code must be "founded on the principles of reformation, and not of vindictive justice." Ind. Const. art. 1, § 18. When examining Trowbridge's sentences for the remaining convictions, we review trial court sentencing decisions only for abuse of discretion, including the trial court's decision to run the sentences concurrently or consecutively, and increase or decrease the presumptive sentence because of aggravating or mitigating circumstances. *See Archer v. State*, 689 N.E.2d 678, 683 (Ind.1997) (citing *Smith v. State*, 675 N.E.2d 693, 697 (Ind.1996), *Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind.1996), and *Mott v. State*, 273 Ind. 216, 402 N.E.2d 986, 988 (1980)). To deviate from the statutorily proscribed presumptive sentence, the trial court must "(1) identify all of the significant mitigating and aggravating circumstances, (2) state the specific reason why each circumstance is considered to be mitigating or aggravating, and (3) articulate the court's evaluation and balancing of the circumstances to determine if the mitigating circumstances offset the aggravating ones." *Carter v. State*, 711 N.E.2d 835, 838 (Ind.1999) (citing *Hammons v. State*, 493 N.E.2d 1250, 1254 (Ind.1986)).

 Trowbridge offered his age, the fact that he was under the influence of a substance that can promote violent behavior, the difficulty he will experience in the prison system, and his remorsefulness and letters of apology to Swindell's family as mitigating circumstances to be considered in his sentencing. The trial court rejected all of these possible mitigators. We only address age as a mitigating circumstance. The trial court judge has primary responsibility for weighing aggravating and mitigating circumstances at sentencing. *See Ross v. State*, 676 N.E.2d 339, 347 (Ind.1996) (quoting *Smith v. State*, 580 N.E.2d 298, 303 (Ind.Ct.App.1991), *trans. denied*). However, the trial court is not obligated "to credit or weigh a possible mitigating circumstance as defendant suggests it should be credited or weighed." *Archer v. State*, 689 N.E.2d 678, 684 (Ind.1997) (citations omitted). We will find that the trial court failed to identify or properly weigh a mitigating factor only where we are persuaded that the "mitigating evidence is both significant and clearly supported by the record." *Carter*, 711 N.E.2d at 838 (citations omitted).

The trial court judge rejected the sentencing consultant's recommendations and Trowbridge's argument that age be considered as a mitigating factor. Trowbridge was fourteen years old when he murdered Swindell. The trial court noted "[T]he age of the defendant is not a mitigating circumstance. The defendant by his actions and his deeds ... has by such behavior rejected his youth and indulged his chronologically teenaged body into adult malevolent behavior." (R. at 2078.) Although it is not entirely clear what the

(3) the other person is so mentally disabled or deficient that consent to sexual intercourse cannot be given;

commits rape, a Class B felony. However, the offense is a Class A felony if it is committed by using or threatening the use of deadly force, if it is committed while armed with a deadly weapon, or if it results in serious bodily injury to a person other than a defendant.

5. Ind.Code § 35–45–11–2 (1993).

Abuse of a corpse. Sec. 2. A person who knowingly or intentionally:
(1) mutilates a corpse; or
(2) has sexual intercourse or sexual deviate conduct with the corpse;
commits abuse of a corpse, a Class D felony.

trial court intended by this comment, it would appear by this reasoning that age could never be a mitigating circumstance in considering the sentence of a juvenile convicted of serious crimes. We disagree. Indiana decisional law recognizes "that a defendant's youth, although not identified as a statutory mitigating circumstance, is a significant mitigating circumstance in some circumstances" including the commission of a heinous crime by a juvenile. *Carter*, 711 N.E.2d at 842 (citing *Walton v. State*, 650 N.E.2d 1134, 1137 (Ind.1995)). Trowbridge presented sufficient evidence to establish age as a mitigating factor in Trowbridge's commission of his crimes.

▪ Because we find age to be a mitigating circumstance that the trial court should have considered when determining Trowbridge's sentence, we must reweigh the mitigating circumstance against the aggravating circumstances identified by the trial court. *See Carter*, 711 N.E.2d at 840. While the trial court judge enumerated many aggravating circumstances,[6]

Trowbridge's youth is significant.[7] We find that Trowbridge's "youthful age is sufficiently mitigating that the maximum sentence" for each of his convictions is "manifestly unreasonable." *Id.* at 843.

▪ The constitutional requirement that a sentence be proportionate to the offense does not require us to compare sentences among those convicted of the same or similar crimes. *See Willoughby v. State*, 660 N.E.2d 570, 584 (Ind.1996) (citations omitted). However, we are not precluded from doing so. We find the enhanced sentences excessive in light of Trowbridge's age and comparisons to the sentences of other juveniles convicted of the same or similar crimes.[8] We therefore reduce Trowbridge's sentences on all counts to the presumptive sentence (i.e., murder at fifty years; robbery and burglary at thirty years each; aggravated battery and criminal confinement at ten years each; escape at four years; and abuse of a corpse, theft and auto theft at one and one-half years each).[9] We affirm the trial

---

**6.** The trial court found the age of the victim, Trowbridge's prior juvenile history and failure to respond to rehabilitation efforts, and the nature and heinousness of the crime to be the core aggravating circumstances.

**7.** Indiana law provides that a child under the age of sixteen who commits murder cannot be sentenced to death or life imprisonment without parole. *See* Ind.Code § 35–50–2–3(b) (1998). In general, our statutes "evince strong legislative sentiment that" a child younger than sixteen should be treated differently in our judicial and correctional systems than one who is sixteen or older. *Carter*, 711 N.E.2d at 843. Therefore, juvenile sentences must be consistent with our statutory schema and reflect credit for age as a mitigating circumstance where it is a significant mitigator and clearly supported by the record.

**8.** *See, e.g., Carter v. State*, 711 N.E.2d 835 (Ind.1999) (fourteen year old juvenile was convicted of murder of seven year old and sentenced to sixty years, evidence supported kidnaping, battery, confinement, and child molestation in addition to murder but charges were not filed with respect to the former crimes; on appeal we found the maximum sentence of sixty years to be manifestly unreasonable for a fourteen year old offender); *Walton v. State*, 650 N.E.2d 1134 (Ind.1995)

(one hundred twenty (120) year sentence imposed on sixteen year old juvenile who pleaded guilty but mentally ill to brutally beating, stabbing, and murdering both parents was manifestly unreasonable; remanded for imposition of eighty year sentence); *Loveless v. State*, 642 N.E.2d 974 (Ind.1994) (sixteen year old juvenile sentenced to sixty years for murder of twelve year old whom defendant beat and stabbed and then burned to death thinking the victim was already dead); *Harden v. State*, 576 N.E.2d 590 (Ind.1991) (seventeen year old juvenile convicted of murder, rape, robbery and criminal confinement sentenced to one hundred twenty (120) years).

**9.** Defendant did not raise lesser included offense issues on appeal. However, based on the Information filed in this case, it appears that theft is a lesser included offense of the burglary charge and that aggravated battery is a lesser included offense of the murder charge. While Defendant was sentenced to three years for the theft conviction and twenty years for the burglary conviction, the trial court sentenced Defendant to serve the theft sentence concurrent to the burglary sentence and the burglary sentence concurrent to the fifty year robbery sentence. In addition, Defendant was sentenced to twenty years for his aggravated battery conviction to be served

court's decisions regarding concurrent and consecutive service of these sentences. Trowbridge's combined sentence is therefore reduced to a total of ninety-seven (97) years.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.

concurrent to his sixty-five year sentence for murder.