

IN THE

# Court of Appeals of Indiana

J.Q.R.,

*Appellant-Respondent*

v.

State of Indiana,

*Appellee-Petitioner*



FILED

Apr 03 2024, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

April 3, 2024

Court of Appeals Case No.
23A-JV-1879

Appeal from the Hendricks Superior Court

The Honorable Ryan W. Tanselle, Judge

Trial Court Cause No.
32D03-2303-JD-49

---

**Opinion by Judge Crone**
Judges Bailey and Pyle concur.

**Crone, Judge.**

## Case Summary

[1] J.Q.R appeals his adjudication as a delinquent child for committing acts that, if committed by an adult, would be level 1 felony dealing in a controlled substance resulting in death, level 5 felony dealing in a narcotic drug, and level 6 felony possession of a narcotic drug. He argues that the trial court abused its discretion by admitting his statements to police because the State failed to demonstrate that the waiver of his constitutional rights was made after meaningful consultation with his father. He also contends that the trial court abused its discretion by granting the State's motion to continue the factfinding hearing. Finding no abuse of discretion, we affirm.

## Facts and Procedural History

[2] In the spring of 2023, J.Q.R., R.J., and B.H. were high school freshmen. On March 14, R.J. and B.H. texted J.Q.R. and asked to purchase Percocet from him. J.Q.R. went to B.H.'s house and gave R.J. and B.H. eleven round blue pills marked "M30" in exchange for $110. Tr. Vol. 2 at 166. R.J. paid his share electronically using his cellphone, and B.H. paid his share in cash. J.Q.R. stayed a couple hours at B.H.'s house and then left. R.J. and B.H. each took one-eighth of a pill while at B.H.'s house. R.J. went home with the remaining

pills and took more at his house. The following day, B.H. learned that R.J. had died from an overdose. An autopsy revealed that R.J. died of fentanyl intoxication.

[3] Police were called to R.J.'s house, and they found nine round blue pills marked "M30" and part of a tenth pill in R.J.'s nightstand. B.H. told the police that the pills had been purchased from J.Q.R. and gave them his address. Police then obtained a warrant to search J.Q.R.'s home. When the search was executed, J.Q.R., his parents, his brother, and his grandparents were home. Police found a wallet that contained both an expired driver's license that belonged to J.Q.R.'s father (Father) and a small bag of white powder, which was later determined to be heroin.[1] Police found J.Q.R.'s cell phone in his pants pocket. Avon Police Department Detective Cason Elkin spoke with J.Q.R. and Father and advised them of their *Miranda* rights. Detective Elkin offered them an opportunity to talk privately and told them to come and get him if they were willing to speak to him after they consulted with each other. J.Q.R. and Father went into a bedroom and shut the door.

[4] When J.Q.R. and Father came out of the bedroom, they informed Detective Elkin that they were willing to speak with him. The three went into the same bedroom to talk. Their conversation was recorded and admitted at J.Q.R.'s factfinding hearing as State's Exhibit BB. After Detective Elkin confirmed that

---

[1] Neither party indicates where the wallet was found.

J.Q.R. and Father understood their rights, he began questioning J.Q.R. Father also asked J.Q.R. some questions, including whether J.Q.R. knew that the pills contained fentanyl, and J.Q.R. that said he knew. State's Ex. BB at 3:48. Detective Elkin asked J.Q.R. where the pills were, and J.Q.R. led him to a closet in his bedroom. Detective Elkin found a bottle of pills that were the same size and shape as the pills found in R.J.'s nightstand. Subsequent testing revealed that J.Q.R.'s pills were consistent with R.J.'s pills. Tr. Vol. 4 at 38.

[5] After locating the pills, Detective Elkin spoke again with J.Q.R. and Father in the hallway while police continued to search the bedroom. Detective Elkin questioned J.Q.R. about whether there were any additional pills, where he had gotten the pills, and how much he had paid for them. Father told J.Q.R., "I'm going to kick your f**king ass, seriously, because I cannot believe what I am hearing and seeing right now." State's Ex. BB at 12:10-12:16; Tr. Vol. 4 at 93-94.

[6] Detective Elkin continued questioning J.Q.R. and asked how he had gotten to B.H.'s house. State's Ex. BB at 14:38. J.Q.R. told Detective Elkin that Father had taken him. *Id*. at 14:40; 15:15. Father acknowledged that he took J.Q.R. to B.H.'s house but denied that he had any knowledge of the drug deal. *Id*. at 15:28. Father "voluntarily" told Detective Elkin, "[Y]ou're probably gonna find an old bag of dope." Tr. Vol. 2 at 204. Detective Elkin informed him that they had already found it. Father responded, "[W]ow, where'd you guys find that at. I've been looking for it[,]" and he explained that it "was an old baggie from when he was struggling with his addiction." *Id*. at 204, 197. Father was later

charged with possession of the illegal substance. By the time police concluded the search of the home, they had found a box of THC vape cartridges in the bedroom where the pills had been discovered. The box was addressed to Father and had been shipped from California. Police had also found a notebook that contained a ledger with a list of names and amounts owed totaling roughly $9,000. State's Ex. DD at 25:18.

[7] Detective Elkin transported J.Q.R. and Father to the police station for additional questioning. After he led them to an interview room, Father spoke to Detective Elkin in the hallway. According to Detective Elkin, "[H]e was a concerned father trying to make sure that his child is going to be okay. So, he was just trying to understand … if … his son does speak, what is going to happen with that information." Tr. Vol. 2 at 198. Father then went back into the interview room, and the ensuing conversation was recorded and admitted at J.Q.R.'s factfinding hearing as State's Exhibit DD. Father told J.Q.R., "Here's the deal. This conversation isn't going to leave this room." State's Ex. DD at 4:46. He told J.Q.R., "Just be honest with him." *Id*. at 4:55. Regarding the pills, Father said, "You should have never f**king got involved in that." *Id*. at 7:37. At one point Father said, "We had … what was going on just there, they're not worried about that." *Id*. at 7:40.

[8] Detective Elkin entered the interview room and went over their *Miranda* warnings again. Detective Elkin asked them for the passcode to J.Q.R.'s phone. He told them that he was going to apply for a search warrant for the phone and that the phone would be returned if the warrant was not granted. J.Q.R. and

Father agreed to provide the passcode. At one point, Detective Elkin asked about the notebook that police found in the home that contained a list of names and amounts owed totaling roughly $9,000. *Id*. at 25:18. Father explained that it was his and was "old stuff" from when he "used to f**k around years ago." *Id*. at 26:00.

[9] Detective Elkin obtained a search warrant for J.Q.R.'s phone. The phone revealed a cash transaction between J.Q.R. and R.J. According to Detective Elkin, the phone also revealed conversations between J.Q.R. and Father that indicated that they were dealing marijuana or THC vape cartridges together. Tr. Vol. 4 at 38.

[10] On March 17, 2023, the State filed a petition alleging that J.Q.R. was a delinquent child for committing acts that would constitute the following crimes if committed by an adult: level 1 felony dealing in a controlled substance resulting in death, level 4 felony dealing in a narcotic drug, level 6 felony possession of a narcotic drug, class A misdemeanor dealing in marijuana, and class B misdemeanor possession of marijuana.[2] The petition was later amended to allege that J.Q.R. committed level 6 felony theft if committed by an adult. On March 20, the trial court held a probable cause hearing, authorized the State to file the delinquency petition, and found that J.Q.R. should be detained

---

[2] The State charged Father with multiple crimes, including level 4 felony dealing in a narcotic drug, level 5 felony dealing in a schedule IV controlled substance, level 5 felony neglect of a dependent, level 5 felony dealing in marijuana, and level 5 felony contributing to the delinquency of a minor.

because he was a threat to himself and the community's safety. The court set the factfinding hearing for April 14, 17, and 18.

[11] On March 22, the State sent the pills recovered from J.Q.R.'s bedroom to the Drug Enforcement Administration (DEA) laboratory, requested a "rush[,]" and informed the laboratory of the date of the factfinding hearing. Appellant's App. Vol. 2 at 68. On April 5, the State filed a motion to continue the factfinding hearing because it had learned that it would take one to two months to receive the test results and the State intended to call the DEA analyst who performed the lab tests to confirm the pills' contents. On April 10 and 11, the trial court held an attorneys-only hearing on the State's motion, at which J.Q.R.'s counsel objected to the continuance. The trial court granted the State's motion in part, ordered that the factfinding hearing commence on April 14 as scheduled in accordance with Indiana Code Section 31-37-11-2, vacated the all-day settings on April 17 and 18, and informed the parties that the hearing would be resumed at a date to be determined at the April 14 hearing.

[12] On April 14, the factfinding hearing commenced. The State called Detective Elkin and asked him eight questions, including whether his investigation into R.J.'s overdose led him to interview J.Q.R. and whether J.Q.R. was present in the courtroom that day. The State then requested that the matter be continued to a later date. The court granted the request over J.Q.R.'s objection. After the court continued the factfinding hearing, the court held a detention hearing and found that J.Q.R. should continue to be detained. The court then set a

scheduling conference for April 24. At the scheduling conference, the court continued the factfinding hearing to May 15.

[13] On May 14, J.Q.R. filed a motion to suppress evidence of his statements to Detective Elkin. The factfinding hearing recommenced the following day, and the court heard evidence on the motion and denied it. On June 26, the factfinding hearing was resumed. The trial court adjudicated J.Q.R. a delinquent child for committing acts that, if committed by an adult, would be level 1 felony dealing in a controlled substance resulting in death, level 5 felony dealing in a narcotic drug, and level 6 felony possession of a narcotic drug. On July 18, the trial court made J.Q.R. a ward of the Department of Correction until he turned eighteen years old. This appeal ensued.

## Discussion and Decision

### Section 1 – The trial court did not abuse its discretion by admitting J.Q.R.'s statements to police.

[14] J.Q.R. contends that the trial court erred by admitting his statements to Detective Elkin at his home and at the police station. "Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances." *Jones v. State*, 982 N.E.2d 417, 421 (Ind. Ct. App. 2013) (citation omitted), *trans. denied*.

[15] Specifically, J.Q.R. asserts that the State failed to establish that he received the safeguards provided by Indiana Code Section 31-32-5-1. Section 31-32-5-1

protects a child's rights guaranteed by the United States Constitution and the Indiana Constitution, including the right against self-incrimination, by, in pertinent part, permitting the waiver of those rights by the child's custodial parent where "(A) that person knowingly and voluntarily waives the right; (B) that person has no interest adverse to the child; (C) meaningful consultation has occurred between that person and the child; and (D) the child knowingly and voluntarily joins with the waiver[.]" "If section 31-32-5-1 is violated, 'the introduction in evidence of a statement made by a person under eighteen years of age is forbidden.'" *Stewart v. State*, 754 N.E.2d 492, 495 (Ind. 2001) (quoting *Stidham v. State*, 608 N.E.2d 699, 700 (Ind. 1993)). "The State bears the burden of proving beyond a reasonable doubt that the juvenile received all of the protections of Indiana Code section 31-32-5-1." *D.M. v. State*, 949 N.E.2d 327, 334 (Ind. 2011).

[16] Our supreme court has emphasized that "the state bears a heavy burden to demonstrate that the opportunity for meaningful consultation, as embodied in the statute, has been satisfied." *Taylor v. State*, 438 N.E.2d 275, 283 (Ind. 1982), *cert. denied* (1983). "The mere presence of a parent, standing alone, does not satisfy the statute." *D.M.*, 949 N.E.2d at 335.

> To prove that "actual consultation of a meaningful nature" occurred, the State needs only to prove that the police provided a relatively private atmosphere that was free from police pressure in which the juvenile and the parent could have had a meaningful discussion about the "allegations, the circumstances of the case, and the ramifications of their responses to police questioning and confessions."

*Id.* (quoting *Trowbridge v. State*, 717 N.E.2d 138, 148 (Ind. 1999)).

[17] Here, Detective Elkin advised J.Q.R. and Father of their rights and offered them the opportunity to confer privately with each other. He told them to come and get him if they decided they were willing to talk to him. They went into a bedroom alone and shut the door. After they talked, they both voluntarily agreed to talk to Detective Elkin. Thus, J.Q.R. was able to have meaningful consultation with his father as required by Section 31-32-5-1.

[18] Nevertheless, J.Q.R. claims that the consultation with Father did not satisfy Section 31-32-5-1 because Father "had everything to gain from encouraging his son's cooperation with the police[,]" as his "home was full of evidence of his illicit drug activity." Appellant's Br. at 13. J.Q.R. adds that Father transported him to the "fatal drug deal" and that Detective Elkin testified that there was evidence that Father was working with J.Q.R. to sell the THC vape pens. *Id.* According to J.Q.R., the "quicker [Father] could get the police out of his home and focused on the drug activity of his son[,] …. he might be able to avoid the consequences of the THC vape pens in his name." *Id.* at 13-14.

[19] Our review of the record shows that Father, not Detective Elkin, voluntarily brought up the presence of the baggie containing drugs and that Father took ownership of it. Father also willingly admitted that the ledger the police found was his and not J.Q.R.'s. These actions reflect a parent's commitment to protecting his child, not an effort to avoid criminal prosecution. According to Detective Elkin, "[Father] was a concerned father trying to make sure that his

child [was] going to be okay." Tr. Vol. 2 at 198. As for Father taking J.Q.R. to B.H.'s house, the evidence shows that Father did not know that J.Q.R. was going to sell drugs there. We conclude that Father did not have an interest adverse to J.Q.R., and thus the requirements of Section 31-32-5-1 were satisfied. *Compare N.B. v. State*, 971 N.E.2d 1247, 1254 (Ind. Ct. App. 2012) (concluding that mother did not have interest adverse to child's where mother faced potential criminal liability regardless of how child's younger sibling was shot), *with Borum v. State*, 434 N.E.2d 581, 584 (Ind. Ct. App. 1982) (concluding that case worker who joined child in waiver had interest adverse to child's where case worker filed charging petition). As such, the trial court did not abuse its discretion by admitting J.Q.R.'s statements.

## Section 2 – The trial court did not abuse its discretion by granting the State's request for a continuance.

[20] J.Q.R. also asserts that the trial court abused its discretion by granting the State's motion to continue the factfinding hearing and that the court's commencement of the factfinding hearing did not comply with Indiana Code Section 31-37-11-2. Section 31-37-11-2 provides that, if a child is in detention, "a fact-finding hearing or a waiver hearing must be commenced not later than twenty (20) days, excluding Saturdays, Sundays, and legal holidays, after the petition is filed." If the factfinding hearing is not commenced within the statutory deadline, "the child shall be released on the child's own recognizance or to the child's parents, guardian, or custodian." Ind. Code § 31-37-11-7. Failure to commence the factfinding hearing does not provide for dismissal of

the charges or discharge of the child. *Brown v. State*, 448 N.E.2d 10, 16 (Ind. 1993).

[21] The State argues that the issue is moot because we are unable to provide a remedy to J.Q.R. for the alleged error. *See In re A.C.*, 198 N.E.3d 1, 9 (Ind. Ct. App. 2022) ("An issue is moot when no effective relief can be rendered to the parties before the court."), *trans. denied*, *cert. denied* (2024). However, we may decide a case on the merits "under an exception to the general rule when the case involves questions of 'great public interest.'" *C.T.S. v. State*, 781 N.E.2d 1193, 1198 (Ind. Ct. App. 2003) (quoting *R.A. v. State*, 770 N.E.2d 376, 378 (Ind. Ct. App. 2002)), *trans. denied*. "Issues that are likely to recur–such as the observation of the twenty-day detention limit of Indiana Code § 31-37-11-2 when DNA testing is involved–generally fall within the public interest exception." *C.L.Y. v. State*, 816 N.E.2d 894, 900 (Ind. Ct. App. 2004), *trans. denied* (2005). This case, too, involves lab testing and is likely to reoccur. Thus, we will address this issue on the merits.

[22] In juvenile cases, the State may move for a continuance as provided by Indiana Code Section 31-37-11-8:

> If a child moves for discharge, the prosecuting attorney may move for a continuance of the factfinding hearing or waiver hearing because of the absence of a witness if the prosecuting attorney makes an official statement:
>
> (1) setting forth the name and address of the witness if known;

(2) indicating the probability of procuring the witness's testimony within a reasonable time;

(3) showing that the absence of the witness has not been procured by the act of the prosecuting attorney;

(4) stating the facts to which the prosecuting attorney believes the witness will testify and the prosecuting attorney's belief that the facts are true; and

(5) stating that the prosecuting attorney is unable to prove the facts specified under subdivision (4) through the use of any other witness whose testimony may be as readily procured.

Upon a motion for a continuance under this section, "the court may continue the factfinding hearing or the waiver hearing for not more than ninety (90) days." Ind. Code § 31-37-11-9. Although J.Q.R. did not file a motion for discharge, we find Section 31-37-11-8 applicable.

[23] Here, the State filed the delinquency petition on March 17, 2023. On March 22, the State sent the pills to the DEA laboratory, requested a "rush[,]" and informed the laboratory of the date of the factfinding hearing. Appellant's App. Vol. 2 at 68. The State learned that it would take one to two months to receive the results and promptly moved for the continuance on April 5. The State's motion for a continuance stated that the matter involved a substance alleged to be fentanyl and that the State had sent the substance to the DEA laboratory, requested a "rush" on the results, and provided the date of the factfinding hearing. *Id*. The State also indicated that it had "received an estimated wait time of one to two

months to receive" the test results. *Id.* Finally, the State informed the court that it intended "to call the DEA Analyst who performs the lab testing during the Fact Finding hearing in anticipation of their testimony confirming the substance to be Fentanyl." *Id.* We conclude that the State's motion sufficiently complied with Section 31-37-11-8. Further, the trial court commenced the factfinding hearing within twenty days of the filing of the petition as required by Section 31-37-11-2, granted the State's motion to continue, and concluded the factfinding hearing within ninety days as required by Section 31-37-11-9. Thus, the trial court was following the statutory process. Under these circumstances, we cannot say that the trial court abused its discretion by granting the State's motion for a continuance. Therefore, we affirm.

[24] Affirmed.

Bailey, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Zachary J. Stock
Zachary J. Stock, Attorney at Law, P.C.
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Catherine E. Brizzi
Deputy Attorney General
Indianapolis, Indiana