ATTORNEY FOR APPELLANT

Montague M. Oliver, Jr.

Anderson, Indiana 

ATTORNEYS FOR APPELLEE

Pamela Carter

Attorney General of Indiana

James D. Dimitri

Deputy Attorney General

Indianapolis, Indiana

IN THE

SUPREME COURT OF INDIANA

KEVIN LAMAR CARTER,       ) 

)

Appellant (Defendant Below), ) Indiana Supreme Court

) Cause No. 48S00-9603-CR-240

v. )

 ) 

STATE OF INDIANA,     )

)

Appellee (Plaintiff Below). )

)

­

APPEAL FROM THE MADISON CIRCUIT COURT

The Honorable Fredrick R. Spencer, Judge

Cause No. 48C01-9411-CF-229

­

ON DIRECT APPEAL

BOEHM, Justice.

On August 24, 1994, a seven year old girl was brutally stabbed and beaten to death.  Fourteen year old Kevin L. Carter was charged with murder and was waived into adult court where, after a mistrial, a jury convicted him as charged.  He was sentenced to sixty years in prison.  On this direct appeal, Carter presents four issues:

I. Was his confession properly admitted?

II. Did the trial court err in refusing to grant defense counsel’s requests for a continuance?

III. Did the prosecutor’s remarks during closing argument result in prosecutorial misconduct?

IV. Did the trial court err in sentencing?

We affirm the conviction and remand for new sentencing.

Factual Background

The victim and Carter lived in the same apartment complex in Anderson, Indiana.  On the afternoon of her death the victim asked Carter for help with a flat tire on her bicycle.  According to Carter’s confession, he intended to help her find a bicycle pump so she could fix the tire.  The two went to his apartment together.  While she watched television in his mother’s bedroom, Carter entered the room with his trousers off.  He retrieved a steak knife from a night stand and told the victim that if she did not take off her clothes, he would kill her.  She laughed in response.  Carter then dropped the knife, approached her, took off her clothes, and attempted sexual intercourse but failed to penetrate.  After telling the victim to put her clothes on, Carter donned his trousers and at some point changed his shirt and put the steak knife into his pocket.  He then led the victim out the back door of the apartment, telling her not to tell anyone what had happened.  Finally, he took her by the arm to a nearby wooded area.  When she screamed Carter killed her. 

The victim’s body was discovered in the early hours of the next day. Police had investigated her disappearance and were aware that a neighbor had seen the victim with a “big black kid” at about the time she was last seen.  Carter and his friend Clifton Jones fit this description and were questioned by the police both before and after discovery of the body.  In his first statement to police, Carter claimed to have been with Jones at the time of the killing.  The police learned, however, that Jones was out of town and could not have been with Carter.  On September 13, the police picked up Carter and Jones after school and brought them to the police station for questioning.  Both mothers were called to the station.  After Carter’s mother, Marchal Armstead, arrived and met for several minutes with Carter, the two were given a waiver of rights form.  A detective read the rights aloud and they both signed the waiver form acknowledging the reading.  They then refused an offer to consult privately with each other, and signed the waiver form again, this time formally acknowledging waiver of Carter’s rights.  Shortly after the questioning began, Carter asked to speak with the detectives alone and Armstead agreed to leave the room.  The interview continued without Armstead and eventually Carter confessed.  At trial, in addition to the confession, the evidence indicated that Carter’s tennis shoes were stained with human blood.  DNA tests showed a 99.9% probability that the blood was the victim’s.  An expert determined that pubic hair found on the victim’s body was similar in characteristics to a sample of Carter’s pubic hair.  Ink impressions taken from the bloody pair of Carter’s shoes were consistent with an imprint on the victim’s arm.

I. Admissibility of Confession

At both the first and second trial, Carter’s motion to suppress the confession was denied.  The motion presents two related issues: voluntariness of the waiver of 
Miranda
 rights and voluntariness of the confession.  Carter contends that he did not voluntarily waive his 
Miranda
 rights, citing 
Fare v. Michael C.
, 442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (applying the totality of the circumstances approach to determine whether a juvenile has waived his rights).  Carter also contends that his confession was involuntary and therefore should be excluded under the authority of 
Jackson v. State
, 269 Ind. 256, 379 N.E.2d 975 (1978), 
Ashby v. State
, 265 Ind. 316, 354 N.E.2d 192 (1976), and 
Pamer v. State
, 426 N.E.2d 1369 (Ind. Ct. App. 1981).  These cases, and the authorities they cite, ultimately rely on 
Malloy v. Hogan
, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964), which explicitly turned on the Fourteenth Amendment’s incorporation of the Fifth Amendment privilege against self incrimination to evaluate the voluntariness of a confession in a state court prosecution.  The verbal formulation of the test for voluntariness is the same for both the waiver and the confession -- the totality of the circumstances.  
Ashby
, 265 Ind. at 321, 354 N.E.2d at 195.

As to the waiver issue, Indiana Code § 31-6-7-3 sets out additional specific requirements for a valid waiver of Indiana state or federal constitutional rights by a juvenile.  Under the relevant part of the statute, these rights may be waived only:

(2) by the child’s custodial parent . . . if:

(A) that person knowingly and voluntarily waives the right;

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver.

Ind. Code
 § 31-6-7-3(a)(2) (1993).
(footnote: 1)  Carter asserts that the waiver was involuntary.  The standard of appellate review of a trial court’s ruling as to the voluntariness of a waiver is made with regard to the totality of the circumstances considering only evidence favorable to the state and any uncontested evidence.  
Tingle v. State
, 632 N.E.2d 345, 352 (Ind. 1994).  Relevant circumstances include the child’s physical, mental, and emotional maturity; whether the child or parent understood the consequences of the child’s statements; whether the child and parent had been informed of the delinquent act; the length of time the child was held in custody before consulting with his parent; whether there was any coercion, force, or inducement; and whether the child and parent were advised of the child’s right to remain silent and to the appointment of counsel.  
Ind. Code
 § 31-6-7-3(d) (1993).

Applying these factors to the facts of this case, we conclude that Carter’s waiver was voluntary.  Carter and Armstead were presented with a waiver of rights form.  They both acknowledged verbally or by nodding that they understood each right after each was read aloud by a detective.  They both signed the form indicating that they had been informed of Carter’s rights.  They were given an opportunity to consult privately with each other immediately after the rights were read.
(footnote: 2) 
 They declined the opportunity to consult.  They then signed the form again to indicate that they waived Carter’s constitutional rights.  There is no allegation or evidence in the record of coercion, force, or inducement.  There is no evidence that Carter or Armstead did not know or understand what they were doing. 

The only concern as to the waiver arises because of uncertainty as to whether Armstead was aware at the time she signed the waiver that Carter was a suspect.  It is clear that Carter and Armstead were aware of the girl’s murder.  Although Carter had not been charged or told that he was a suspect, the reading of rights after being unexpectedly brought to the police station is a clear indication that the rights should be taken seriously.  More importantly, a suspect’s parent or guardian need not be aware that her ward is a suspect for there to be an effective waiver.  
Tingle
, 632 N.E.2d at 352-53 (neither juvenile defendant nor his custodian were informed of the possible offenses to be charged, or that defendant could be charged as an adult, but that fact alone was not enough to overturn trial court’s finding of voluntariness); 
Smith v. State
, 580 N.E.2d 298, 301 (Ind. Ct. App. 1991) (“[parent’s] own failure to appreciate the fact that her son was in jeopardy of prosecution even though he had not been identified” is by itself, insufficient to render a waiver involuntary).  In addition, Carter and Armstead were told of the right to remain silent and the right to counsel.  Carter was alone at the station for no more than an hour before consulting with Armstead.  Carter does not argue, nor does the record show, that at the time of waiver, Carter was physically, mentally, or emotionally immature for someone of his age.  In light of all of the above factors, we cannot say that the trial court’s conclusion to admit the confession was unsupported by the totality of the circumstances. 

The second issue is the voluntariness of the confession.  In effect, Carter contends that his confession was involuntary because it was induced by an implied promise.  Carter argues that Detective Copeland, Carter’s interrogator, impermissibly led Carter to believe that if he confessed he would be tried as a juvenile.  We conclude that Carter’s confession was voluntarily given.

The Fourteenth Amendment incorporates the Fifth Amendment privilege against self incrimination.  
Withrow v. Williams
, 507 U.S. 680, 688-89, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993); 
Malloy
, 378 U.S. at 6-7
.  Accordingly, to be admissible consistent with federal due process, a suspect’s confession must be voluntarily given. 
Ashby
, 265 Ind. at 321-22, 354 N.E.2d at 196.  
The admissibility of a confession is for the trial court in the first instance, based on an evaluation of the totality of the circumstances, including whether the confession was voluntarily made and not provided through inducement, violence, threats, or other improper influences.  
Warner v. State
, 579 N.E.2d 1307, 1309 (Ind. 1991).  On review, we do not weigh the evidence, but determine if there was substantial evidence of probative value to support the trial court.  
Id.
 (citing 
Massey v. State
, 473 N.E.2d 146, 147 (Ind. 1985)).

After Carter and Armstead waived their 
Miranda
 rights, the police began a videotaped interview of Carter with Armstead present.  During the interview, Carter indicated that he wanted to talk to the police outside his mother’s presence.  She agreed to leave the room and the interview continued.  At first, Carter stated that he saw a man in a green car talking with the victim near her house, and that the man drove the car and stopped outside her front door.  Copeland asked why Carter was reluctant to relay this information with Armstead present.  Carter said he was scared to talk to the police because the man in the car might have seen him.  Copeland said there was nothing to be scared of, that Carter should tell the truth because people thought that Carter might have committed the murder, and that no one else had seen a green car.  Then Carter said:

Carter: Can I ask you a couple of questions?

Copeland: Okay, go ahead.

Carter: Just so I’ll know.  What would happen to this guy?

Copeland: It depends.  He would probably get some help more than anything else, especially if he’s young.  Because we get into that area where kids make mistakes.   Some kids make big mistakes, but they’re still mistakes.  See?  The law is set up so that you’re not considered an adult until you’re 18.  So until you’re 18, the law looks at you a lot differently, you see.  It considers you a child first and then your actions--

Carter: So, if like he was older he would go to jail?

Copeland: If he was older he would be in big, big, big trouble.  Now I’m telling you, if he was younger, he’s in trouble too.

Carter: Yeah, and he’d go to like juvenile hall or something?

Copeland: Well, that’s a possibility, you see.  It depends on his age.  Now, are we talking about a young kid here?

Carter: Yes.

Copeland: Okay.  Who are we talking about?

Carter: Me.

Carter then provided a detailed confession of the crime.

There is substantial evidence available that would permit the trial court to decide, under the totality of the circumstances, that the impact of the above exchange did not influence Carter so as to overcome his will.  Perhaps most importantly, there is no evidence that Copeland, either expressly or by implication, directly promised Carter that he would be tried as a juvenile.  Copeland said: “The law is set up so you’re not considered an adult until you’re 18.”  This general statement is not accurate in this context.
(footnote: 3)  It is a comment about the legal system and not a personal promise to Carter regarding his status.  
Compare
 
Pamer
, 426 N.E.2d at 1374-75 (distinguishing between a direct promise of immunity in exchange for a confession, one rising “to the level of a guarantee,” with a “mere exhortation”) 
with
 
Ashby
, 265 Ind. at 321, 354 N.E. 2d at 196 (a direct representation that defendant would receive a “ten flat” sentence instead of a life sentence rendered confession involuntary).
 More significantly, any potential the statement had to mislead Carter was vitiated by the exchange that followed.  Carter interrupted Copeland to ask if an older culprit would go to jail.  Copeland answered that an older man would be in “big, big, big trouble” but that a younger person would be in “trouble too.”  Carter asked: would the younger man go to juvenile hall?  Copeland responded: “Well, that’s a possibility. . . . It depends on his age.”  Here, Copeland said only that going to juvenile hall was a possibility.  The suggested possibility of treatment as a juvenile is less aggressive than some of the statements that have been held not to render a confession involuntary.  For example, in 
Ortiz v. State
, 265 Ind. 549, 552, 356 N.E.2d 1188, 1192 (1976) a police officer told the defendant that if he confessed, the officer would “see what he could do” and “could probably talk to the prosecutor and make a deal.”  There was sufficient evidence to support the trial court’s conclusion that the defendant’s confession was voluntary.  
Id.
  Similarly, in 
Ward v. State
, 408 N.E.2d 140, 143 (Ind. Ct. App. 1980), an officer’s promise to “help . . . in every way he could” was held to be too vague and indefinite to undermine the voluntariness of the confession.  And, in 
Love v. State
, 272 Ind. 672, 676, 400 N.E. 2d 1371, 1373 (1980), an officer who told the juvenile defendant that if he did not confess he might go to adult prison and that his “cooperation might help in assisting him” was held not to promise that the defendant’s cooperation would guarantee leniency or assure the defendant of trial as a juvenile.  

In addition, as we noted in 
Jackson v. State
, 269 Ind. 256, 260, 379 N.E.2d 975, 977 (1978), although an accused must be aware of the probable consequences of his act, “not every misapprehension concerning the extent and nature of criminal liability to which a confession may expose the accused vitiates the voluntariness of the confession.”  Officer Copeland made clear to Carter that the person who committed the murder would be “in trouble” regardless of age.  In 
Jackson
, the accused juvenile and his parents were not told that first degree murder was outside the jurisdiction of the juvenile court.  The defendant was under the impression that he would be tried as a juvenile, but he was told, and the rights form he signed confirmed, that his confession could be used against him in both juvenile and adult proceedings.  
Id.
  The form Carter and Armstead signed informed them that any statement could be used “in court.”  If Carter was under the misapprehension that he would be tried in juvenile court, it was not because of any promise by the police or because of language on the rights waiver form.  Finally, Carter initiated the dialogue.  
Cf.
 
Coppock v. State
, 480 N.E.2d 941, 944 (Ind. 1985) (defendant initiated discussion that led to the alleged promise, tending to show that “the subject [of the promise] was not used as a coercive tool to overbear [defendant’s] will to resist.”).  There is no evidence of coercion by Detective Copeland, nor can his response to Carter’s question be considered, under the circumstances, as unfairly teasing Carter to confess, or inducing him to make an unreliable statement.  In sum, the evidence indicates that Carter wanted to tell the police something and that the police did not induce him into making an involuntary statement.  There is substantial evidence of probative value for the trial court to have properly admitted the confession.

II. Request for a Continuance

At Carter’s first trial, resulting in a mistrial, he was represented by Montague Oliver.
(footnote: 4) On July 17, 1995, R.C. Dixon was appointed to replace Oliver in the retrial scheduled to begin on September 5.  Carter contends that the trial court erred when it failed to grant any of Dixon’s repeated oral requests for a continuance to permit additional time to prepare for trial.  We conclude that the trial court was within its discretion in denying Dixon’s requests for a continuance.

Between his appointment and the scheduled trial date, Dixon was involved in two unrelated jury trials, covering July 18 to July 25, and August 15 to August 22.  He also attended an out-of-state conference from August 3 to August 14.  On August 2, Dixon filed a verified petition to rescind his appointment and to have Oliver reappointed. The petition was denied on August 8.  At a pretrial hearing on August 30, Dixon again asked for Oliver’s reappointment but was rebuffed.  Dixon then requested a continuance stating that he was “completely unprepared” for trial.  He renewed this request the next day and on the first day of trial.  During the trial he repeatedly made similar requests which were repeatedly denied.  After the State rested, Dixon moved for a mistrial based on, in part, the court’s failure to grant a continuance.  Alternatively, Dixon requested a continuance of two weeks.  Both his motion and his request were denied. 

The standard of review of a trial court’s ruling on a continuance not required by statute
(footnote: 5) is abuse of discretion.  
Elmore v. State
, 657 N.E.2d 1216 (Ind. 1995).  There must be a clear demonstration of an abuse of that discretion, 
id.
 at 1218, and the record must show that the accused was prejudiced.  
Beverly v. State
, 543 N.E.2d 1111, 1113 (Ind. 1989).  Most importantly, a conclusory declaration that more time would have been helpful is not enough to show that the trial court abused its discretion.  Under 
Olson v. State
, 563 N.E.2d 565, 569 (Ind. 1990), we consider the totality of the circumstances in determining if there was sufficient time to prepare, including the complexity of the issues, the necessity for pretrial motions, the necessity to interview witnesses, and whether the defendant can assist in the preparation.

Carter argues that Dixon’s other commitments did not allow him enough time to prepare his case.  Even allowing for these commitments, he had twenty-one full days, including five days after his initial request for a continuance had been denied.  Carter claims that Dixon needed more time to consult with experts and to do research.  An abuse of discretion by the trial court requires a specific showing as to how the additional time requested would have aided counsel.  
Clark v. State
, 539 N.E.2d 9, 11 (Ind. 1989).  Here, Carter fails to claim specifically which experts Dixon would have called, what issues he would have researched, or in what way he was prejudiced by the lack of additional time. 

Carter argues that the case involved complicated issues, such as DNA testing, the admissibility of a juvenile’s confession, shoe impression evidence, and hair comparison evidence.  While it is true that some of the issues in the case were complex, their complexity was significantly mitigated by the fact of the first trial.  Since mid-August, Dixon had the benefit of Oliver’s discovery.  And on August 30, he was presented with all of the State’s evidence used at the first trial and given access to the transcript from the first trial.  As a result, Dixon had access to the State’s witnesses and strategy, which were the same for the second trial.  The benefit of prior counsel’s preparation is a factor in favor of refusing a continuance.  
Flinn v. State
, 563 N.E.2d 536, 543 (Ind. 1990); 
Underwood v. State
, 515 N.E.2d 503, 505 (Ind. 1987).  The first trial also made it less necessary for Dixon to make pretrial motions or interview witnesses.

Just as Carter fails to make a specific showing in this Court, Dixon provided the trial court with no specific reasons for a continuance.  At the August 30 pretrial hearing, Dixon said he needed time to conduct an investigation, confer with his client, file discovery requests, and perhaps seek a change of venue.  But he had already had sufficient time to do many of these things.  By August 30, he would have had at least fifteen days to do research, confer with Carter, consult with experts, and review the discovery from the first trial.   More importantly, Dixon’s requests for more time were not particularized.  When the trial court asked him to formulate more specific requests Dixon merely repeated that if he had more time he would call experts, or do research, without noting which experts or what research.  Indeed the only particularized request Dixon made, for an investigator, was immediately granted by the trial court.

In sum, this was a retrial, not a fresh start.  Dixon had at least twenty-one days to prepare for trial.  During most of that time, he had available the discovery from the first trial.  Neither Dixon’s requests to the trial court, nor Carter’s claim before us, demonstrates specifically what use Dixon would have made of any additional time.  On more than one occasion, the court told Dixon he needed to be more specific, and the court granted the one specific request made.  For all these reasons, we conclude that the trial court did not abuse its discretion in refusing to grant a continuance.

III. Prosecutorial Misconduct

Carter next alleges prosecutorial misconduct based on comments made during closing argument.  Because Carter did not object to the comments at trial and request an admonishment, the issue is waived.  
Isaacs v. State
, 673 N.E.2d 757, 763 (Ind. 1996).  To avoid waiver, Carter alleges that the comments resulted in fundamental error.  For prosecutorial misconduct to be fundamental error, it must be demonstrated that the prosecutor’s conduct “subjected the defendant to grave peril and had a probable persuasive effect on the jury’s decision.”  
Id.
 (citing 
Miller v. State
, 623 N.E.2d 403, 408 (Ind. 1993)).

Carter contends that the following statements made in the prosecutor’s closing argument impermissibly commented on the defendant’s failure to testify:

Is Mr. Dixon trying to tell you [that the victim] wasn’t killed?  I don’t think that can possibly be what he’s saying.  Was she killed?  There cannot be a doubt about that. [She] was murdered.  Did Kevin Carter do it?  That’s the only issue here.  And what I submit to you, ladies and gentlemen, what you did not hear from Mr. Dixon, what you did not hear are explanations.  Explanations to why did he lie?  Did you hear him say one explanation?  Why did he lie?  Why did he . . . why did he lie to the cops on August 24th when they came to see him in the privacy of his house [before the discovery of the body]?  Why did he lie?  You didn’t have an explanation for that cause there isn’t one.  He lied because he had something to hide.  He had murdered [the victim] a few hours earlier and didn’t want the cops to know.  That’s why he lied.   You didn’t hear that explanation and you’re not going to.

You didn’t hear Mr. Dixon say one thing about [why Carter lied to police after they found the body].  It was because he didn’t have anything to say about it.  He had no explanation for it cause Kevin lied cause he had murdered [the victim] the day before.   No explanation.  No explanation at all why you lie about seeing a missing little girl that everybody in this community is trying to find.  Why would you lie about something like that?  You’re not gonna hear that reason because he doesn’t have an explanation for that.  He wants you to speculate about nonsense that isn’t related to what this case is all about.  

What else you did not hear because he doesn’t have an explanation is how in the world Kevin Carter knew about the injuries to [the victim] . . . .

In determining whether a prosecutor’s comments are error, fundamental or otherwise, we look to see if the comments in their totality are addressed to the evidence rather than the defendant’s failure to testify.  If so, there are no grounds for reversal.  
Hopkins v. State
, 582 N.E.2d 345, 348 (Ind. 1991); 
Hill v. State
, 517 N.E.2d 784, 788 (Ind. 1988).  Arguments that focus on the uncontradicted nature of the State’s case do not violate the defendant’s right to remain silent.  
Issacs
, 673 N.E.2d at 764.

Carter argues that the prosecution’s repeated references to defense counsel’s failure to offer “explanations” were impermissible indirect comments on the defendant’s failure to testify.  We disagree.  The prosecutor reasonably commented on the uncontradicted nature of the State’s case.  During trial, the State introduced testimony demonstrating that Carter lied to police before and after the discovery of the murder.  The defense did not respond, leaving the evidence uncontradicted.  An explanation of why Carter lied (or did not lie) would not necessarily come directly from Carter’s testimony.  The prosecutor’s comments do not refer to the defendant’s failure to testify and so do not constitute error under established precedent.  
See Hopkins
, 582 N.E.2d at 348.

IV. Sentencing

The trial court sentenced Carter to the maximum sentence of sixty years under Indiana Code § 35-50-2-3.  However, as we noted in 
Smith v. State
, 675 N.E.2d 693 (Ind. 1996), for murders committed between July 1, 1994 and May 5, 1995 there were two versions of Indiana Code § 35-50-2-3 on the books.  We concluded that P.L. 158-1994, which provides a presumptive forty year sentence for murder subject to a twenty year enhancement,
(footnote: 6) rather than P.L. 164-1994, which provides a presumptive fifty year sentence for murder subject to a ten year enhancement, applies to murders during this period.  
Id.
 at 697.  
See also
 
Jones v. State
, 675 N.E.2d 1084, 1086-87 (Ind. 1996).

It is unclear from the record which statute the trial court applied.  The court decided that aggravating factors outweighed mitigating factors and imposed a sixty year sentence.  The court did not state whether the presumptive sentence was forty or fifty years, though both parties in their briefs assumed the presumptive sentence was fifty years.  Similarly, the court did not discuss whether the aggravating factors warranted a twenty year or a ten year enhancement of the presumptive sentence.  Because it is unclear which statute the court applied, we remand for new sentencing pursuant to P.L. 158-1994.  

Carter also contends that the trial court did not properly substantiate aggravating factors or adequately weigh the mitigating and aggravating factors.  It is within the trial court’s discretion to determine the appropriate sentence and the trial court will be reversed only upon a showing of a manifest abuse of discretion.  
Ector v. State
, 639 N.E.2d 1014, 1015 (Ind. 1994).  The court’s discretion includes the weighing of aggravating and mitigating factors.  
Id.
  When imposing an enhanced sentence, the trial court must identify all significant mitigating and aggravating circumstances, state the specific reasons why each circumstance is considered to be mitigating or aggravating, and balance the mitigating and aggravating circumstances in order to determine whether the aggravating circumstances offset the mitigating circumstances.  
Henderson v. State
, 489 N.E.2d 68, 71 (Ind. 1986).  The trial court has not met this requirement.  

In sentencing Carter, the court listed some of the aggravating factors set out in Indiana Code § 35-38-1-7.1 without much, if any, explanation as to their application to this case.  For example, the court identified as an aggravating factor that Carter was at high risk to commit another crime but did not explain why.  Similarly, the court quoted affirmatively and without explanation the aggravating factor that a defendant needed rehabilitative treatment best provided by a penal facility.  To enhance a presumptive sentence by reason of this aggravator, however, the court must provide a specific or individualized statement of the reason why this defendant was in need of correctional or rehabilitative treatment that could best be provided by a penal facility in excess of the presumptive term.
(footnote: 7)  
Hollins v. State
, 679 N.E.2d 1305, 1308 (Ind. 1997); 
Mayberry v. State
, 670 N.E.2d 1262, 1270 (Ind. 1996).  One of the purposes of the specificity requirement is to protect against arbitrary and capricious sentences.  In some circumstances, for example a prior criminal record, the record obviously supports the court’s conclusion.  For example, in 
Henderson
, 489 N.E.2d at 72, we concluded that the record there indicated that the defendant did have a prior criminal history and that the trial judge engaged in the evaluative processes but simply did not sufficiently articulate his reasons for enhancing the sentence.  In this case, however, there appear to be mitigating factors not elaborated by the trial court, including notably Carter’s youth, absence of prior record, achievements in school, and deportment.

Conclusion

We affirm the conviction and remand for new sentencing consistent with this opinion.

SHEPARD, C.J., and SULLIVAN and SELBY, JJ., concur.

DICKSON, J., dissents without opinion.

FOOTNOTES
1: This section was amended in 1995 in respects not material to this case.  
See
 1995 Ind. Acts, P.L. 268, § 9.

2: This was presumably directed to the statutory “meaningful consultation” requirement.  
Ind. Code 
§ 31-6-7-3(a)(2)(C) (1993).  This requirement may be satisfied by the express opportunity for a consultation that is forsaken in the presence of the proper authority, so long as the waiver of constitutional rights is knowingly and voluntarily made.  
Callahan v. State
, 527 N.E.2d 1133 (Ind. 1988).

3: In fact, the officer misstated the law applicable to a juvenile charged with murder.  Indeed, Indiana law provides that upon a prosecutor’s motion and after a full investigation and hearing, a child of only ten years of age “shall” be treated as an adult in a murder case if the juvenile court makes certain statutorily required findings.  
Ind. Code
 § 31-6-2-4(d) (Supp. 1996).  A juvenile court does not have jurisdiction in cases of murder by a person sixteen years of age or older at the time of the crime.  
Ind. Code
 § 31-6-2-1.1(d)(1) (1993).  In this case, the officer’s mistake was not material because Carter was fourteen years old.  However, because the test is one of totality of the circumstances, such an error, if made to a person who was sixteen or seventeen, could affect the voluntariness of a confession. 

4: Oliver requested to be removed from the case on May 22, 1995 and his appointment was duly rescinded by the trial court.

5: Carter does not claim he was entitled to a continuance under Indiana Code § 35-36-7-1.

6: P.L. 158-1994 states: 

Sec. 3.(a) A person who commits murder shall be imprisoned for a fixed term of forty (40) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances; in addition, the person may be fined not more than ten thousand dollars ($10,000).

(b) Notwithstanding subsection (a), a person who was at least sixteen (16) years of age at the time the murder was committed may be sentenced to: 

(1) death; or

(2) life imprisonment without parole;

under section 9 of this chapter unless a court determines under IC 35-36-9 that the person is a mentally retarded individual.

7: When the trial court listed aggravating and mitigating factors, it discussed whether “[i]mposition of a reduced sentence . . . would depreciate the seriousness of the crime.”  
Ind. Code
 § 35-38-1-7.1(b)(4) (1993).  This factor, however, may be used only when considering whether to reduce a sentence below the presumptive level and not as a reason to increase a sentence.  
Ector v. State
, 639 N.E.2d 1014, 1016 (Ind. 1994).  It is unclear from the court’s discussion in what respect it relied upon this factor.