**Mark T. WILLIAMS, Defendant–Appellant,**

v.

**STATE of Indiana, Plaintiff–Appellee.**

**No. 48S00–9808–CR–471.**

Supreme Court of Indiana.

Aug. 18, 2000.

David W. Stone, IV, Anderson, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Teresa Dashiell Giller, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

DICKSON, Justice

The defendant, Mark T. Williams, appeals his conviction for the August 20, 1994, murder[1] of John Frank Lewis. The trial court ordered a sixty-year sentence, to run consecutively to a sentence he was already serving in the State of Illinois. This appeal alleges trial error in (1) permitting leading questions; (2) sentencing;

1. IND.CODE § 35–42–1–1.

and (3) ineffective assistance of trial counsel. We affirm the defendant's conviction and remand for re-sentencing.

### A. Examining of Witness

The defendant contends that the trial court abused its discretion in allowing, over defense objections, the State to ask leading questions on direct examination. The State responds that the questions were proper because the witness was reluctant to testify for fear of her own safety and that of her children.

■■■ Indiana Evidence Rule 611(c) provides that leading questions should not be used on the direct examination of a witness. However, the rule permits leading questions when they are necessary to develop the witness's testimony and whenever a party calls a hostile witness, an adverse party, or a witness identified with an adverse party. Ind. Evidence Rule 611(c). Our case law has allowed leading questions on direct examination to develop the testimony of certain kinds of witnesses—for example, children witnesses; young, inexperienced, and frightened witnesses; special education student witnesses; and weak-minded adult witnesses. See, e.g., Bussey v. State, 536 N.E.2d 1027, 1029 (Ind.1989); Altmeyer v. State, 519 N.E.2d 138, 141 (Ind.1988); King v. State, 508 N.E.2d 1259, 1263 (Ind.1987); Ward v. State, 246 Ind. 374, 379, 205 N.E.2d 148, 151 (1965); Stallings v. State, 232 Ind. 646, 648, 114 N.E.2d 771, 772–73 (1953); Ingram v. State, 463 N.E.2d 483, 485 (Ind.Ct. App.1984). The use of leading questions is limited in order to prevent the substitution of the language of the attorney for the thoughts of the witness as to material facts in dispute. Thompson v. State, 674 N.E.2d 1307, 1309–10 (Ind.1996); Webster v. State, 206 Ind. 431, 436, 190 N.E. 52, 54 (Ind.1934). A leading question is one that suggests to the witness the answer desired. Goodman v. State, 479 N.E.2d 513, 515 (Ind.1985). However, the mere mention of a subject to which a witness is desired to direct his or her attention is not considered to be a suggestion of an answer. Id. The use of leading questions on direct examination generally rests within the trial court's discretion. Thompson, 674 N.E.2d at 1309–10; Garrison v. State, 589 N.E.2d 1156, 1158 (Ind.1992); Webster, 206 Ind. at 436, 190 N.E. at 54. See ROBERT LOWELL MILLER, JR., INDIANA EVIDENCE, 13 INDIANA PRACTICE § 611.302 (1995 & Supp.2000).

■■■ The defendant challenges four portions of the direct examination of a witness, Octavia McDade, who at the time of the murder was twenty years old. The first question the defendant challenges is: "The man you saw standing next to the black S–10 pickup truck on August 20, 1994, is this man right here in this purple shirt, isn't it, Octavia?" Record at 330. It appears from the Record that, as defense counsel objected, the witness answered, "Yes." Record at 330. The defendant contends that this question told the witness what the defendant was wearing so she could identify him as the shooter.

This question was asked in the following context:

State: Did there come a time when you saw a man at the driver's side door?

Witness: Yes.

State: You ever seen that man before?

Witness: Not until he looked at me.

State: The man at the driver's side door looked at you?

Witness: Yep.

State: Did you know who he was?

Witness: I knew him but I didn't know his name.

State: Do you see him in the courtroom today?

Witness: Yeah.

State: The man you saw standing next to the black S–10 pickup truck on August 20, 1994, is this man right here in this purple shirt, isn't it, Octavia?

Defense Counsel: That's a leading question, Your Honor.

Witness: Yes.

Defense Counsel: I object.

State: Well, point to the man you saw at John Lewis' black S–10 pickup truck. Do you see him in the courtroom?

Witness: Yes.

State: Point to him?

Witness: He's sitting over there.

State: This man that I'm pointing to, is that who you saw?

Witness: Yes.

State: Is that Marcus Williams?

Witness: If that's his name, yeah.

State: That's the man, isn't it?

Witness: Yes.

Record at 329–30. Considering this question in the context of the testimony supplied by the witness, we note that, before defense counsel objected, the witness had already testified that the man who was at the driver's side door the day of the murder looked at her, that she knew him, and that he was in the courtroom when she was testifying. In the testimony that followed the challenged question, the witness pointed to the man she saw next to the driver's side door and testified that this man was the defendant. The question— "The man you saw … is this man right here in this purple shirt, isn't it, Octavia?"—is clearly leading.

■ The second portion that the defendant challenges arose in the following exchange:

State: Did you go anywhere after your sister's house, Octavia?

Witness: Yeah, I went to Walmart.

State: You went on with your day with your family, didn't you?

Witness: Yep.

State: Did you call the police?

Witness: No.

State: You didn't call the police and say, "I just saw a man that was murdered." You didn't do that?

Witness: No.

State: Why not?

Witness: Because I didn't want to be in it. I didn't want to have nothing to do with it.

State: Cause you didn't want to face that man, did you?

Witness: Nope.

Defense Counsel: Your Honor, I'm going to object again and in direct examination, leading questions are not permissible.... And they also, uh, these questions also contain conclusions or testimony. That's our objection just for the record.

Record at 336. We agree that "[c]ause you didn't want to face that man, did you?" is a leading question.

The third question challenged by the defendant is as follows: "Did you think the same thing might happen to you that happened to John Lewis [the murder victim]?" Record at 338. After the defense objected, the State asked, "Did you think the same thing would happen to you or your children that happened to John Lewis?" Record at 338. The witness responded: "Including (inaudible) me and my children." Record at 339. The defendant contends that the State thereby told her that she was afraid for her safety and that of her children so she had an excuse for not voluntarily coming forward with information.

The following exchange preceded this question:

State: Didn't want to be here, did you?

Witness: Nope.

State: Why?

Witness: Because I don't want to have nothing to do with it.

State: Because you got kids, is that right?

Witness: Yep. I got two (2) kids and I done … everything's well without doing this.

State: Did there come a time when Detective Tracy came to see you?

Witness: Yep.

State: Do you know Detective Tracy over here, Octavia?

Witness: Yes.

State: You've seen him before?

Witness: Yes.

State: Did he come to see you?

Witness: Yes, at my mother's house.

State: You were at your mother's house?

Witness: Yep.

State: Why were you at your mother's house?

Witness: Cause I didn't want to go home.

State: You didn't go back to your house after the murder?

Witness: Nope.

State: Why not?

Witness: Cause I didn't want to.

State: Were you afraid to go back home?

Witness: Yeah.

State: What were you afraid of?

Witness: Me and my kids, that's what I was afraid of. For me and my kids. I was afraid for me and my kids. That's all I know.

Record at 337–38. From the context surrounding the question, we note that the witness had already testified without objection that she did not want to get involved in the case, that she had two children, that she did not return home after witnessing the murder, that she was staying at her mother's house, that she did not want to return home, and that she was afraid for her own safety and that of her children.

The fourth question challenged by the defendant was, "Did you go to school with the man that murdered John Lewis?" Record at 340. The defense objected to the question, but the witness did not answer the question. The State then asked, "Did you tell Detective Tracy you had went to school with the man that murdered John Lewis?" Record at 340. The witness responded, "Yeah, little bitty

kids." Record at 340. The State clarified, "Elementary school?" Record at 340. The witness again replied, "Yeah." Record at 341. The defendant argues that the State told her how she knew the defendant.

This testimony was preceded by the following exchange:

State: Did [Detective Tracy] tell you that he knew you were a witness to the murder?

Witness: Yeah, he said something about (inaudible). Seen me standing on my porch when it happened.

State: Did you tell him the truth when he confronted you that, in fact, you had been a witness to the murder of John Lewis? Did you tell Detective Tracy what you saw?

Witness: It took him a minute to get it out of me.

State: You didn't want to tell, did you?

Witness: Nope.

State: But you finally did, didn't you?

Witness: Yep.

State: You told him what happened, didn't you?

Witness: Yep.

State: You told him what you saw, didn't you?

Witness: Um hum (affirmative response).

State: Did you tell him you knew the man who killed John Lewis?

Witness: No.

State: What did you say?

Witness: I didn't know him. I didn't know his name.

State: You'd seen him before, didn't ya? Hadn't ya?

Witness: Yeah.

Record 339–40. We note that the witness earlier testified that she knew the defendant but did not know his name, that the context of the question includes the witness's testimony that she had seen the shooter before, and that the witness did

not answer the question to which the defense objected. The defense did not object to the numerous other leading questions.

■ Although the State argues that the leading questions were proper because the young witness was fearful of her own safety and that of her children, we note that the apprehensive and vulnerable emotional state of a witness may well increase his or her susceptibility to suggestive questions and impair the accuracy of the resulting responses. Such circumstances amplify the wisdom of the proscription against leading questions. In the present case, however, we decline to reverse because the trial court's action in permitting these leading questions, even if erroneous, was not inconsistent with substantial justice and did not affect the substantial rights of the defendant. Ind. Trial Rule 61.

## B. Sentencing

■ The defendant contends that the trial court abused its discretion in imposing, under P.L. 164–1994, a presumptive sentence of fifty years enhanced by ten years for aggravating circumstances. The trial court sentenced the defendant to the maximum sentence of sixty years under Indiana Code section 35–50–2–3. Determining the appropriate sentence is within the trial court's discretion, and the trial court will be reversed only upon a showing of manifest abuse of discretion. *Archer v. State,* 689 N.E.2d 678, 683 (Ind.1997); *Carter v. State,* 686 N.E.2d 1254, 1263 (Ind.1997). We have noted that, for murders committed between July 1, 1994, and May 5, 1995, two versions of Indiana Code section 35–50–2–3 existed on the books. *See Carter,* 686 N.E.2d at 1262–63; *Jones v. State,* 675 N.E.2d 1084, 1086–87 (Ind.

1996); *Smith v. State,* 675 N.E.2d 693, 695–97 (Ind.1996). We have previously held that P.L. 158–1994, which provides a presumptive forty-year sentence for murder subject to a twenty-year enhancement, rather than P.L. 164–1994, which provides a presumptive fifty-year sentence for murder subject to a ten-year enhancement, applies to murders during this period. *Smith,* 675 N.E.2d at 697.

Because it is clear from the record that the trial court applied P.L. 164–1994, we remand for a new sentencing hearing.[2]

## C. Assistance of Counsel

Urging that his trial counsel provided ineffective assistance, the defendant contends that his trial counsel was deficient in four [3] areas: (1) failure to object to testimony about the family of the deceased; (2) failure to offer evidence of deceased's possession of marijuana at the time of death; (3) failure to object to evidence of a witness's fears for her safety and that of her family; and (4) failure to object to improper closing argument.

■ A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also Williams v. Taylor,* 529 U.S. ——, ——, 120 S.Ct. 1495, 1511–12, 146 L.Ed.2d 389, 416–17 (2000). First, the defendant must show that counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. This requires showing that counsel's representation fell below an objective standard of reasonableness, *id.* at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693, and that

---

2. In his brief, the defendant also contends that the trial court improperly found aggravating circumstances by merely reciting the statutory factors and not explaining the application of the circumstances to the case and that his sentence is manifestly unreasonable. Because we find the sentence to be otherwise erroneous and remand for a new sentencing hearing, it is inappropriate to address these claims.

3. The defendant also contends that his trial counsel provided ineffective assistance by erroneously agreeing that, at the time of the killing, the presumptive sentence for murder was fifty years. Because we hold that his sentence is erroneous and remand for a new sentencing hearing, we need not consider this aspect of his claim of ineffective assistance.

counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment, *id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95. Thus, a strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 695. "The court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Furthermore, isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Bieghler v. State,* 690 N.E.2d 188, 199 (Ind.1997); *Davis v. State,* 598 N.E.2d 1041, 1051 (Ind. 1992); *Ingram v. State,* 508 N.E.2d 805, 808 (Ind.1987).

▆▆▆ Second, the defendant must show that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for coun-

sel's unprofessional errors, the result of the proceeding would be different. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The defendant contends that his trial counsel failed to object when the widow of the deceased victim testified as to the number of years that she was married to the deceased, where they lived, the children they had together, and the victim's employment. The defendant contends that this evidence was irrelevant to the case, that it was prejudicial in that it lead the jury to sympathize with the victim, and that no tactical reason supports failing to object.

▆▆▆ The defendant also contends that his trial counsel failed to effectively offer evidence of the deceased's possession of marijuana at the time of death. The defendant's trial counsel intended to offer evidence that the deceased possessed marijuana at the time of death and thereby to suggest that the victim's character was not as good as the State claimed when the State argued that the victim was living out the American dream. The trial court found such evidence irrelevant and refused to allow it. The defendant now urges that trial counsel did not realize that the evidence could be admitted under the doctrine of curative admissibility [4] and that counsel's ignorance of the law rendered him incapable of carrying out his strategy. The defendant contends that he was prejudiced because this evidence "could have undermined the jury's view of the deceased as an innocent victim brutally gunned down for no reason," Brief of Defendant at 14; convinced the jury that this was "simply another drug user getting killed, in short nothing really important," Brief of Defendant at 14; and "undercut

---

4. The doctrine of curative admissibility allows evidence which is otherwise inadmissible to be presented because similar evidence has been introduced by the adverse party. *See* BLACK'S LAW DICTIONARY 381 (6th ed.1990); 1 WIGMORE, EVIDENCE § 15 (Tillers rev.1983).

the jury's sympathy for the deceased," Brief of Defendant at 15.

Further, the defendant alleges that trial counsel failed to object to evidence of Octavia McDade's fears for her safety and that of her family. *See supra* Section A discussing McDade's testimony. The defendant contends that this evidence was irrelevant and prejudicial as anonymous threats against the life of a witness.

Finally, the defendant asserts that his trial counsel failed to object to the prosecutor's improper closing argument and that no conceivable tactical reason supports choosing not to object. The defendant urges that the prosecutor's discussion of his own background, the character of the housing project where the murder occurred, and the residents of the housing project was improper. The prosecutor argued:

> I grew up on welfare. Orphans homes, foster homes, public housing. I grew up in that environment, but I never lived in the Fountain Street Apartments or any place like it. I've been to the Fountain Street Apartments many times as a police officer, as a prosecutor. We deal with the Fountain Street Apartments all the time. [Defense counsel] never lived in a place like that Fountain Street Apartments.... None of you have either. I just don't believe that you can understand and fairly appreciate the things ... the kind of things that go on in a complex like the Fountain Street Apartments if you don't experience it first hand.

Record at 459–60. The defendant argues that this argument was unsupported by the evidence and that he was prejudiced in the following two ways: it created an excuse for McDade's failure to voluntarily report to the police the person she claimed

did the shooting and to back up her claim that she feared for her own safety and that of her children; and it served to dehumanize the defendant, picturing him as one who resides at such a place and one who is a member of a threatening, criminal underclass with whom the jury had nothing in common.

The defendant also contends that the prosecutor improperly played upon his position, identifying himself as a law enforcement officer who served for many years as a police officer and now as a prosecutor, arguing that prosecutors have a duty to do justice, unlike defense lawyers who have a duty of loyalty to their clients, and urging that he was making arguments and presenting evidence, not because he was an advocate trying to win a case, but because he had determined the evidence led to no other conclusion.[5]

█ Considering the performance prong of ineffective assistance of counsel, we note that the defendant's trial counsel challenged jurors during voir dire; objected to the State's motion in limine; developed and followed a trial strategy; made an opening statement; objected to leading questions asked by the State during direct examination of one of its witnesses; objected to the admission of certain evidence; cross-examined the State's witnesses; challenged one of the State's witnesses as to her identification of the defendant as the shooter; offered exhibits; moved to admit evidence; requested and tendered a limiting instruction, which was given to the jury; tendered proposed final instructions; objected to one of the State's proposed final instructions; moved for a directed verdict on the robbery charge; and presented a closing argument.

Considering the prejudice prong, we note that the evidence in this case demonstrated the following: within the few days

---

5. The prosecutor's line of argument is highly questionable and has been disapproved by this Court. *See, e.g, Craig v. State,* 267 Ind. 359, 367–68, 370 N.E.2d 880, 884 (1977). *See also Miller v. State,* 623 N.E.2d 403 (Ind. 1993). Because the defendant did not timely object to this argument, the trial court had no opportunity to correct any error, and the issue is presented only as part of the defendant's claim of ineffective assistance of counsel.

before the murder, the defendant was observed around the apartment complex where the murder occurred; on the morning of and shortly before the murder, the defendant and a few other young men were observed on a porch near the murder scene; one of the State's witnesses observed the defendant and the other young men around the victim's truck, saw the defendant with a gun, and heard a shot fired; this witness knew the defendant from elementary school, even though he had later moved to Illinois, and identified him from a photographic array; the defendant's palm print was found on the driver's side door of the victim's truck, the side of the truck from which the gun was fired; and the gun used in the murder was also used in another crime committed in Illinois twenty-two days before the murder and the defendant was present at the scene of the Illinois crime.

We find that the defendant's trial counsel's performance did not fall below an objective standard of reasonableness and that defense counsel's performance rendered the defendant's trial a reliable adversarial testing process. Even if we were to find that the performance of the defendant's trial counsel fell short at points and despite the highly questionable nature of a portion of the prosecutor's closing argument, the defendant has not shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different, and thus our confidence in the outcome is not undermined. We reject the defendant's claim that his trial counsel provided ineffective assistance.

### Conclusion

We affirm the defendant's conviction, vacate the trial court's sentencing order, and remand for a new sentencing hearing.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.