**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JOHN C. BOHDAN**
Bohdan Law Office
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| EDWIN RWOTI, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A04-1304-CR-181 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D05-1205-FD-696

**December 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Edwin Rwoti appeals his conviction for sexual battery, as a Class D felony, following a jury trial. Rwoti raises a single issue for our review, namely, whether he received ineffective assistance from his trial counsel.[1] We affirm.

## FACTS AND PROCEDURAL HISTORY

Between 2009 and 2011, A.J. worked as a medical assistant for Bethesda Lutheran Communities ("Bethesda"), an assisted living facility that staffed homes in which people with special needs resided. On December 8, 2011, A.J. worked overnight at a home on Stellhorn Road in Fort Wayne. At some point, Rwoti, another Bethesda employee, arrived at the home to relieve another staff member.

According to A.J.'s subsequent testimony:

A    Everything was normal until I had went to the restroom and I had come out and I was standing kind of towards the TV, watching the TV and he came up behind me and wrapped his arms around me.

\* \* \*

Q    Where did his hands go when they wrapped around you?

A    At first just around me . . . and then he started reaching for my breasts, trying to pull my shirt up.

\* \* \*

Q    So you were able to get out of the embrace and you went outside.

A    Yes.

---

[1] Insofar as Rwoti references the fundamental error doctrine, we agree with the State that he has "conflate[d] the fundamental error exception . . . with ineffective assistance of counsel." Appellee's Br. at 11. Because we fully consider and resolve Rwoti's ineffective assistance of counsel claim, we need not consider any purported arguments under the fundamental error doctrine.

Q      So what happened when you got outside?

A      I knew my girlfriend [Aimee] was working third shift at another house, so I called her.

* * *

Q      What happened when you came back in the house?

A      I got on the computer.  I continued to talk to Aimee, for over an hour.  Edwin didn't say anything.

* * *

Q      So you're sitting down at the computer, you're talking to Aimee, you talked to Aimee on your phone for about an hour?

A      Um-hum (indicating affirmative response).

Q      What happens then?

A      He comes into the kitchen and grabs my wrist and he pulls me up and tries to pull me towards the couch.

* * *

Q      Okay . . . .  How do you respond, what do you do?

A      I try to pull away from him. . . .  [W]e ended up on the floor, I don't know if I was pushed or we tripped because I was trying to pull away from him.  I was still on the phone.

* * *

Q      You end up on the floor.  What happens when you get on the floor?

A      He was trying to take my coat off.

Q      Okay.

A      He was holding me down.  He was trying to undo my pants because I had jeans on.  He just kept trying and I just kept pulling on my coat and he

3

would like grab my arm and try with the other hand grabbing my breasts, kissing me.

Q      Are you saying anything to him?

A      Stop.

* * *

A      I was scared.  I felt like I had a duty to protect [the residents].

* * *

Q      Did you notice anything about Edwin or his clothing when he's got you down on the ground?

A      His pants were undone.

Q      What's going through your head . . . ?

A      He's going to rape me.

Q      So you're telling him no, stop.  Does he stop when you tell him no?

A      No.

Q      Can you move?  Can you get out from under him at this point?

A      I did eventually.

Q      How long do you think the struggle lasted?

A      A few minutes.  Maybe five minutes.

Q      You said you were still on the phone with Aimee.  Where was the phone during this struggle?

A      I was still trying to hold onto it.

Q      Okay.  Did you scream out to Aimee . . . ?

A      I was paying more attention on getting away from him than I was talking on the phone.

4

\* \* \*

Q      What happened next?

A      I got away from him and I went straight outside.

Q      What happened when you got outside . . . ?

A      I told Aimee what had happened. . . .

Transcript at 99-105.

On May 18, 2012, the State charged Rwoti with sexual battery, as a Class D felony. At his ensuing jury trial in February of 2013, among other witnesses the State called A.J. and Aimee to testify, and Aimee corroborated A.J.'s testimony. The jury found Rwoti guilty as charged and the trial court entered its judgment of conviction and sentenced Rwoti accordingly. This appeal ensued.

## DISCUSSION AND DECISION

Rwoti asserts that his trial counsel rendered ineffective assistance.[2] A claim of ineffective assistance of counsel must satisfy two components. Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that,

---

[2] We decline the State's request to dismiss this appeal and oblige Rwoti to raise his claim of ineffective assistance of counsel in the post-conviction forum. However, we note that, by making this argument on direct appeal, res judicata prevents Rwoti from raising the argument again in any petition for post-conviction relief he may file. See Rondon v. State, 711 N.E.2d 506, 517 (Ind. 1999).

but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

Rwoti does not identify any single error by his trial counsel that, by itself, was "so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." Id. at 687-88. Rather, Rwoti asserts that "[t]he trial record . . . is replete with deficiencies throughout such that Mr. Rwoti's right to a fair determination of guilt or innocence was compromised." Appellant's Br. at 9. In particular, Rwoti asserts that his trial counsel could have objected at several opportunities where he did not do so. "[I]n order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show an objection would have been sustained if made." Overstreet v. State, 877 N.E.2d 144, 155 (Ind. 2007). Further, our Supreme Court has acknowledged that counsel may have a legitimate "strategy of declining to object." Id. "[C]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." Pruitt v. State, 903 N.E.2d 899, 906 (Ind. 2009) (quotations and alteration omitted).

The entirety of Rwoti's appeal is premised on allegedly leading questions asked by the prosecutor during her examination of witnesses. Rwoti also asserts that several of these questions called for inadmissible hearsay testimony by the witnesses. As we have explained:

> Indiana Evidence Rule 611(c) provides: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony." A leading question is one that suggests the desired answer to the witness. Williams v. State, 733 N.E.2d 919, 922 (Ind. 2000). The use of leading questions is limited in order to prevent the

substitution of the attorney's language for the thoughts of the witness as to material facts in dispute. Id. The trial court is afforded wide discretion in allowing leading questions, and the court's decision will be reversed only for an abuse of discretion. Bussey v. State, 536 N.E.2d 1027, 1029 (Ind. 1989).

\* \* \*

[W]here a witness's testimony is not distorted to conform to the possibilities suggested by the question, any error resulting from the question is harmless. [Doerner v. State, 500 N.E.2d 1178, 1183 (Ind. 1986)].

Jones v. State, 982 N.E.2d 417, 430-32 (Ind. Ct. App. 2013), trans. denied. "Harmless error is defined as an error that does not affect the substantial rights of a party." Lander v. State, 762 N.E.2d 1208, 1213 (Ind. 2002).

Rwoti first asserts that his counsel should have objected to the following two questions asked by the State during A.J.'s direct examination:

Q    Okay. Did you scream out to Aimee, he's raping me, he's raping me. Or what did you say to Aimee if anything at that time?

A    I was paying more attention on getting away from him than I was talking on the phone.

Q    Okay, so you weren't really talking to Aimee, you were just telling Edwin no, to stop and try to get away from him.

A    Yeah.

Transcript at 105. According to Rwoti, "[t]his series of testimonial questions was problematic not only for its leading quality[] but also for the suggestion of uncharged misconduct more serious than the charge at issue in the case." Appellee's Br. at 10.

Rwoti misconstrues the record. The prosecutor's reference to "rape" occurred only after A.J. had herself testified that she thought Rwoti was "going to rape" her.

7

Transcript at 104. And the prosecutor's second, purportedly leading question above merely rephrased A.J.'s answer to the first question. As such, neither of those questions substituted "the attorney's language for the thoughts of the witness," see Jones, 982 N.E.2d at 430, and we have no reason to believe that an objection to either of these two questions would have been sustained. Hence, we cannot say that Rwoti's counsel rendered ineffective assistance for not objecting to these questions.

Rwoti next asserts that numerous questions by the prosecutor throughout the trial were both leading and called for hearsay testimony by the questioned witness. Rwoti first complains about the following line of examination of A.J.:

Q   Did Jason and Gillian [Bethesda's management] just accept your statement that you just wanted to go to a different house or did they push the issue for you[?]

A   They pushed the issue.

* * *

Q   Okay. And then did you notify somebody that [Rwoti] called?

A   Yes. I called Jason and Jason said that he had just let him know that he was going to be off the floor for investigation.

* * *

Q   [W]hen you went in and talked to Jason and Gillian, were you told that this was a private investigation and you were not supposed to talk about it?

A   Yes.

* * *

Q   Alright. And did you also hear through the investigation about a text message that Edwin said was from your phone saying that this is not my

8

regular phone, my hubby checks my phone, don't call me on this phone. Do you remember . . . do you know what I'm talking about?

A    I didn't find that out until he admitted to everybody. . . . Bethesda kept asking me, do you have another phone, do you have another phone, and I didn't know what they were talking about.

Transcript at 110, 112-13, 116-17.

While these questions may have been leading, any error here was harmless. Again, "[h]armless error is defined as an error that does not affect the substantial rights of a party." Lander, 762 N.E.2d at 1213. At this point in A.J.'s testimony, she had already explained Rwoti's attack on her to the jury. These additional questions, which related to Bethesda's subsequent investigation of A.J.'s complaint, was likely of minimal impact on the jury on the ultimate question of whether Rwoti had committed sexual battery. In light of that, Rwoti's trial counsel may well have made a strategic decision to not object to these questions, and we will not reconsider that strategy. See Pruitt, 903 N.E.2d at 906.

Moreover, the last question quoted above calls for A.J. to testify as to out-of-court statements Rwoti had made. An objection to this question on hearsay grounds would not have been sustained because Rwoti is a party opponent and his statements are not hearsay. Ind. Evidence Rule 801(d)(2). As such, Rwoti cannot demonstrate that his counsel rendered ineffective assistance for not objecting to these questions.

Next, Rwoti complains about the prosecutor's following examination of Aimee:

Q    Alright. And [A.J.] talked to you. Did she express some concern to you about something that was going on in the house?

A    Yes.

Q    What did she say what her concern was?

A       She just said that she felt like the guy that was training her was getting kind of grabby and handsy.

Q       Did she tell you that he actually did touch her?

A       She said he like hugged and I guess he tr[ied] . . . groping . . . her.

* * *

Q       Okay.  Did there come a point when you started hearing something that maybe concerned you?

A       After about an hour probably I could hear some noises like some movement, and I heard her say stop, no, and so I asked her, is he really messing with you, and she said yes.

Q       And you heard this kind of wrestling sound.  What did it sound like was going on?

A       Just like maybe being tugged or something.

Q       And you heard her say no, stop.

A       Yes.

Id. at 149-50.

Rwoti asserts that the prosecutor's questions called for Aimee to testify to inadmissible hearsay.  Rwoti is incorrect.  Indiana Evidence Rule 803(2) provides an exception to the general prohibition on hearsay testimony for excited utterances.  An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement caused by the event or condition."  Evid. R. 803(2).  Aimee's testimony regarding what A.J. had told her immediately following Rwoti's first assault and what she heard while Rwoti was attacking A.J. plainly falls

10

within this exception, and any objection to this testimony by Rwoti's counsel would have failed. Thus, Rwoti did not receive ineffective counsel on this issue.

Finally, Rwoti raises similar complaints about the prosecutor's questioning of Jason Langham, one of Bethesda's managers, and the State's admission of A.J.'s phone records.[3] But A.J.'s testimony and Aimee's corroboration of A.J.'s testimony were both properly before the jury.[4] Langham's testimony and A.J.'s phone records were merely cumulative of the testimony of A.J. and Aimee. It is well established that any error in the admission of cumulative evidence is harmless error. See In re Paternity of H.R.M., 864 N.E.2d 442, 450-51 (Ind. Ct. App. 2007). Accordingly, Rwoti cannot demonstrate that he received ineffective counsel on these issues.

In sum, we cannot say that Rwoti's trial counsel rendered ineffective assistance either in any particular instance at trial or in the accumulation of several instances. As such, we affirm his conviction for sexual battery, as a Class D felony.

Affirmed.

BAKER, J., and CRONE, J., concur.

---

[3] In his brief, Rwoti also complains about his counsel's cross-examination of Langham. But it is clear from the context of Rwoti's analysis that his argument on appeal is how the cross-examination set up the prosecutor to ask purportedly improper questions on redirect. Rwoti does not explain how a poor cross-examination, standing alone, may have amounted to ineffective assistance of counsel. As such, we do not address that potential issue. App. R. 46(A)(8)(a).

[4] Rwoti asserts that the State never "corroborate[d] his accuser's contention of sexual battery." Appellant's Br. at 18. This is incorrect.